UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

```
                                              :
VECOPLAN, LLC,                                :
                                              :
                          Plaintiff,          :       Court No. 20-00126
                   v.                         :
                                              :
UNITED STATES,                               :
                          Defendant.          :
                                              :
```

## <u>**ORDER**</u>

Upon reading plaintiff's motion for summary judgment, defendant's cross-motion for summary judgment, and the parties' respective responses thereto; and upon consideration of other papers and proceedings had herein; it is hereby

**ORDERED** that plaintiff's motion for summary judgment be, and hereby is, denied; and it is further

**ORDERED** that defendant's cross-motion for summary judgment be, and hereby is, granted; and it is further

**ORDERED** that this action be, and hereby is, dismissed.

_____
RICHARD K. EATON, JUDGE

Dated: New York, New York
This _____ day of _____ , 2023.

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

| | |
|---|---|
| VECOPLAN, LLC, | : |
| Plaintiff, | : Court No. 20-00126 |
| v. | : |
| UNITED STATES, | : |
| Defendant. | : |

## **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully moves this Court for an Order:  (1) denying plaintiff's

motion for summary judgment; and (2) granting our cross-motion for summary judgment and

holding that the merchandise at issue is classifiable in subheading 8479.89.94, of the

Harmonized Tariff Schedule of the United States.

The facts and reasoning for defendant's cross-motion for summary judgment are set forth

in the attached memorandum, the exhibits submitted with plaintiff's motion for summary

judgment, and the exhibits submitted with our cross-motion.

WHEREFORE, defendant respectfully requests that an Order be entered denying plaintiff's motion for summary judgment, granting defendant's cross-motion for summary judgment and dismissing plaintiff's complaint in its entirety, and granting such other and further relief as may be just and appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

By: /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Monica P. Triana
MONICA P. TRIANA
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-9240 or 9230

Date:  January 25, 2023          *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| | : | |
| VECOPLAN, LLC, | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00126 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| Defendant. | : | |
| | : | |

---

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

MONICA P. TRIANA
Trial Attorney
Civil Division, Dept. of Justice
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, New York 10278
*Attorneys for Defendant*
Tel. No. 212-264-9240 or 9230

Of counsel:
Sabahat Chaudhary, Esq.
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 2

    A.  The Merchandise At Issue ........................................................................ 2

    B.  Parts And Operation Of The Shredders .................................................. 5

QUESTION PRESENTED .......................................................................................... 13

SUMMARY OF ARGUMENT .................................................................................. 13

ARGUMENT ............................................................................................................ 14

  I.     SUMMARY JUDGMENT FOR THE GOVERNMENT IS WARRANTED ................ 14

  II.    THE SUBJECT MERCHANDISE IS NOT PROPERLY CLASSIFIED
       UNDER SUBHEADING 8749.82.00, HTSUS ............................................. 15

       A.  Interpretive Rules ................................................................................. 15

       B.  The VAZ 1600 And VAZ 1800 Lines Of Industrial Shredders Are Not Properly
           Classified Under Subheading 8749.82.00, Because Their Principal
           Function Is Not "Grinding," "Crushing" or "Screening" ........................................ 15

           1.  The Machines Are Not "Grinding" Machines .............................................. 17

           2.  Plaintiff's Interpretation Of The Term "Grinding" Is Unpersuasive ............. 23

           3.  The Machines Are Not "Crushing" Machines ............................................. 27

           4.  "Screening" Is Not The Principal Function Of The Machine ....................... 29

           5.  The Rule Of Commercial Designation Does Not Apply To This Case ........ 30

       C.  Plaintiff's Application Of The Tariff Statute Is Unpersuasive ................. 30

       D.  The German Version Of The Harmonized System Should Not Be Considered ....... 35

  III.   THE SUBJECT MERCHANDISE IS PROPERLY CLASSIFIED
        IN SUBHEADING 8749.89.94 ............................................................. 36

CONCLUSION ........................................................................................................ 38

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)................................................................................................ 14

*Aves. In Leather, Inc. v. United States,*
  423 F.3d 1326 (Fed. Cir. 2005).............................................................................. 15

*BASF Corp. v. United States,*
  482 F.3d 1324 (Fed. Cir. 2007).............................................................................. 15

*BenQ Am. Corp. v. United States,*
  646 F.3d 1371 (Fed. Cir. 2011)................................................................ 16, 25, 26

*Crown Cork & Seal Co., Inc. v. United States,*
  65 Cust. Ct. 483 (1970)............................................................................ 23, 24, 25

*Cummins, Inc. v. United States,*
  454 F.3d 1361 (Fed. Cir. 2006).............................................................................. 36

*Deckers Outdoor Corp. v. United States,*
  714 F.3d 1363 (Fed. Cir. 2013).............................................................................. 29

*Essex Mfg., Inc. v. United States,*
  30 CIT 1 (2006) ...................................................................................................... 14

*Faus Group, Inc. v. United States,*
  581 F.3d 1369 (Fed. Cir. 2009).............................................................................. 14

*Len-Ron Mfg., Inc. v. United States,*
  334 F.3d 1304 (Fed. Cir. 2003)................................................................ 17, 25, 26

*Lerner New York, Inc. v. United States,*
  908 F. Supp. 2d 1313 (Ct. Int'l Trade 2013) ........................................................ 15

*Marx v. General. Revenue Corp.,*
  567 U.S. 371 (2013)................................................................................................ 29

*Orlando Food Corp. v. United States,*
  140 F.3d 1437 (Fed. Cir. 1998).............................................................................. 14

*Rohm & Haas Co. v. United States,*
   727 F.2d 1095 (Fed. Cir. 1984)..............................................................................30

*Rollerblade, Inc. v. United States,*
   282 F.3d 1349 (Fed. Cir. 2002)..............................................................................37

*Texas Apparel Co. v. United States,*
   698 F. Supp. 932 (Ct. Int'l Trade 1988),
   *aff'd,* 883 F.2d 66 ( Fec. Cir. 1989),
   *cert denied* 493 U.S. 1024 ( 1990).........................................................................14

*United States v. Colonial Commerce Co.,*
   44 CCPA 18 (1956) ............................................................................................23, 24

*W.R. Grace & Co. v. United States,*
   19 C.C.P.A. 326 (1932) ...........................................................................................21

*Warner-Lambert Co. v. United States,*
   407 F.3d 1207 (Fed. Cir. 2005)..............................................................................17

*Well Luck Co., Inc. v. United States,*
   887 F.3d 1106 (Fed. Cir. 2018)..............................................................................37

**Statutes**

Harmonized Tariff Schedule Of The United States

General Rules of Interpretation 1 .................................................................................15

General Rules of Interpretation 6 .................................................................................15

   Section XVII

      Note 3 to Section XVII………………………………………………………16, 31

      Chapter 84

         Note 7 to Chapter 84………………………………………………………16, 31

         Heading 8479 ..............................................................................................*passim*

            Subheading 8479.81 ............................................................................36, 37

            Subheading 8479.82.00.......................................................................*passim*

            Subheading 8479.89 .................................................................................36

Subheading 8479.89.94 ........................................................................*passim*

**Rules**

USCIT Rule 56 ......................................................................................... 1, 14, 26

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

_____

|                                        |   |                   |
|----------------------------------------|---|-------------------|
|                                        | : |                   |
| VECOPLAN, LLC,                         | : |                   |
|                                        | : |                   |
|                    Plaintiff,          | : | Court No. 20-00126 |
|              v.                        | : |                   |
|                                        | : |                   |
| UNITED STATES,                         | : |                   |
|                    Defendant.          | : |                   |
|                                        | : |                   |

_____

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION
FOR SUMMARY JUDGMENT**

Defendant, the United States (Government), respectfully submits this memorandum of

law in opposition to the motion for summary judgment filed by plaintiff, Vecoplan, LLC

(Vecoplan or plaintiff), and in support of our cross-motion for summary judgment, pursuant to

Rule 56 of the Rules of the United States Court of International Trade (USCIT).

## <u>INTRODUCTION</u>

At issue is the appropriate tariff classification of two different lines of plaintiff's

industrial shredders, VAZ 1600 and VAZ 1800.  These large, industrial machines are used to cut,

shred, or otherwise size-reduce a variety of waste materials using a rotating cylinder, also called

a rotor, which is fitted with cutting inserts and sits inside a cutting chamber.  After the material is

dropped into the cutting chamber, a process ram is used to push material towards the rotor.  At

that point, the cutters first reduce the material in size, and then the material is further cut when it

passes through the space between the rotor and a stationary counter knife.  The parties agree that

the shredders are classifiable in heading 8479, Harmonized Tariff Schedule of the United States

(HTSUS), which covers "[m]achines and mechanical appliances having individual functions, not

specified or included elsewhere in this chapter . . . ."  At liquidation, U.S. Customs and Border

Protection (Customs or CBP) classified the shredders in subheading 8479.89.94, HTSUS, which covers, in relevant part, "[o]ther machines and mechanical appliances: . . . other: . . . other," dutiable at 2.5% *ad valorem*.

Plaintiff claims that the shredders are properly classified in subheading 8479.82.00, HTSUS, which covers, in relevant part, "[o]ther machines and mechanical appliances: . . . [m]ixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines." Compl. ¶ 28. This is a duty free provision. However, to be classified in this provision, plaintiff must show that the principal function of the imported shredders is either "[m]ixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring." The undisputed facts show that none of these processes reflect the principal function of the machines. Rather, the facts show that the imported shredders are used to cut, shred or otherwise reduce the size of the material that is fed into the cutting chamber of the machine. Accordingly, the proper tariff classification of the merchandise is under subheading 8479.89.94.

## STATEMENT OF FACTS

### A.  The Merchandise At Issue

This case concerns the tariff classification of Vecoplan's single shaft (or single rotor) shredders, which fall into two specific product lines, the VAZ 1600 and the VAZ 1800. Compl. ¶ 10; Def. Ex. 1 (Interrogatories (Rogs)) at 3-4; *see e.g.*, Def. Ex. 2 (Entry Papers). Vecoplan purchases the machines from the manufacturer, its German parent company, Vecoplan AG.  Compl. ¶ 9; Def. Ex. 2 (Entry Papers); Def. Ex. 3 (Deposition of Thomas Sturm (Sturm

Dep.))[1] at 20:13-18; Def. Ex. 4 (Deposition of Gary Kolbet (Kolbet Dep.)[2] at 20:16-21:5. Although plaintiff's core business is in size reduction machines, like the merchandise at issue, plaintiff sells other products, such as conveyors and machines for screening and storing, which are often used in conjunction with the size reduction equipment to create a complete system. Def. Ex. 3 (Sturm Dep.) at 23:4-25:1; Def. Ex. 4 (Kolbet Dep.) at 17:1-20, 19:11-20:9.

 The specific machines at issue are the VAZ 1600 S, VAZ 1600 SXL, VAZ 1600 SXLT, VAZ 1600 M, VAZ 1600 MXL, VAZ 1800 T, and VAZ 1800 NT.  Compl. ¶ 10; *see e.g.*, Def. Ex. 2 (Entry Papers).  These are large industrial machines, measuring approximately 10 to 14 feet long, 9 to 10 feet wide, and weighing up to 24,000 pounds. Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800).  The different models, designated by letters (S, M, XL, T), vary in terms of the size of the machine, the diameter of the rotor (XL representing the larger diameter), the length of the rotor and ram stroke (S, M), and the function of the machines drive (T representing the high torque drive, which allows variable speed in the rotor).  Def. Ex. 1 (Rogs) at 4; Def. Ex. 3 (Sturm Dep.) at 34:16-35:16, 154:17-155:24; Def. Ex. 4 (Kolbet Dep.) at 31:14-24; Def. Ex. 5 (Deposition of Len Beusse (Beusse Dep.)[3] at 45:6-12, 48:5-24.  Each of the machines at issue "process[es] solid waste material from larger forms to smaller forms," and they each operate in the same manner in terms of the technology used and the process of size reduction.  Def. Ex. 1 (Rogs) at 4; Def. Ex. 3 (Sturm Dep.) at 31:23-32:13.

---

[1] Mr. Sturm is a Vecoplan AG employee, the parent company to Vecoplan, LLC.  His current position is head of the Department of Quality Environmental Safety and Health.  Def. Ex. 3 (Sturm Dep.) at 7:16-25.

[2] Mr. Kolbet is an employee of Vecoplan, LLC.  His current position is Vice President of Engineering.  Def. Ex. 4 (Kolbet Dep.) at 9:3-11.

[3] Mr. Beusse is a former Managing Director and Chief Operating Officer for Vecoplan, LLC.  Def. Ex. 5 (Beusse Dep.) at 10:18-11:3.

The method by which the machines operate is described in two current patents, which were filed by Vecoplan or one of its affiliates, with the U.S. Patent and Trademark Office: Patent No. US 6,837,453 (453 Patent) covering the "Shredder," Pl. Ex. 17 (453 Patent); and Patent No. US 9,144,803 (803 Patent) covering the "Shredder With Multi-Point Cutters."  Pl. Ex. 16 (803 Patent); Def. Ex. 6 (Patent List); Def. Ex. 7 (Patent Application Publication).  Although the two current patents cover modifications and/or improvements to the basic shredder model, not the shredder itself (covered by European patent EP0419919B2, which has expired), Vecoplan has indicated that these patents describe, in detail, the parts and operation of the basic shredder, and its core part, the u-rotor.  Def. Ex. 3 (Sturm Dep.) at 38:25-39:9, 40:10-16, 43:24-44:9; 100:22-101:16, 117:7-15; Pl. Ex. 8 (European Patent) at 1, 5.  Vecoplan agrees that the parts and operation of the shredders at issue are the same as those described in the relevant patents.  Def. Ex. 3 (Sturm Dep.) at 50:17-25; 56:10-13; 67:17-71:3; 108:22-110:5.

As reflected in both U.S. patents, the basic shredder/u-rotor covered by EP0419919B2 represents the "prior art" or the existing knowledge of the machines in the industry.  Def. Ex. 3 (Sturm Dep.) at 38:25-39:9, 43:24-44:9; Pl. Ex. 17 (453 Patent) at 5; Pl. Ex. 16 (803 Patent) at 17.  The technology described in these patents is the same technology used to operate each of the machines at issue.  *Id*.; Def. Ex. 3 (Sturm Dep.) at 50:17-25; Def. Ex. 4 (Kolbet Dep.) at 46:13-48:10.  The operation of the machines was also described in detail by Mr. Thomas Sturm, a Vecoplan AG employee and the inventor identified in the 453 Patent; plaintiff selected Mr. Sturm to testify as its designated agent regarding, among other things, the functioning of the machines, their "operation," and their "uses or intended uses."  Def. Ex. 3 (Sturm Dep.) at 13:9-15:9; Def. Ex. 9 (Dep. Notice).

As described in both U.S. patents, the "invention[s] relate[] to the rotary shredders for shredding various material comprising a rotor and counter knife."  Pl. Ex. 17 (453 Patent) at 5; Pl. Ex. 16 (803 Patent) at 17; Def. Ex. 3 (Sturm Dep.) at 43:2-6, 100:22-101:20.  The machines are sold to members of diverse industries such as the "plastic, paper, wood and solid waste" industries, Def. Ex. 1 (Rogs) at 3, and are "used for shredding a variety of materials such as paper, cardboard, plastic film, cloth, webbing, [and] textile fibers of natural and synthetic material . . . ."  Pl. Ex. 17 (453 Patent) at 5; Pl. Ex. 16 (803 Patent) at 17; Def. Ex. 3 (Sturm Dep.) at 28:17-21, 43:9-23, 135:4-11.  The machines are not intended to reduce the size of more abrasive substances, such as glass, rocks, or material that is highly incinerable.  Def. Ex. 3 (Sturm Dep.) at 101:21-102:22; Def. Ex. 4 (Kolbet Dep.) at 24:9-25:13.

**B.  <u>Parts And Operation Of The Shredders</u>**

The core part of the machines is the rotor, which is a rotating cylinder located inside the machine.  The rotor is equipped with sharp inserts, called cutters, which are responsible for the reduction in size of the material fed into the machine.  Def. Ex. 3 (Sturm Dep.) at 35:24-36:10, 44:14-22; Pl. Ex. 17 (453 Patent) at 2 (Item No. 12); Pl. Ex. 16 (803 Patent) at 4 (Item No. 12).  The following is a depiction of the rotor and counter knife for the shredder, identified in the 803 Patent.



**FIG. 3**
**(Prior Art)**

Pl. Ex. 16 (803 Patent) at 6.  As shown above, the outside of the rotor has both ribs and valleys, with the ribs protruding out from the rotor, and a valley between each rib.  Pl. Ex. 16 (803 Patent) at 6 (Item No. 22, Ribs), 17; Pl. Ex. 17 (453 Patent) at 5; Def. Ex. 3 (Sturm Dep.) at 45:11-46:1.  In addition, there is a stationary counter knife, which has teeth that align with the valley in the rotor.  Def. Ex. 16 (803 Patent) at 6 (Item No. 14, Counter Knife; Item No. 24, Teeth), 17; Pl. Ex. 17 (453 Patent) at 5; Def. Ex. 3 (Sturm Dep.) at 46:2-18.  The cutters, which are called "v-cutters" because they protrude out in the shape of a "v," are mounted in pockets on the rib of the rotor; when the rotor spins, they "mesh[]" with the v-shaped recesses in the counter knife.  Pl. Ex. 17 (453 Patent) at 4 (Item No. 30, Cutters), 5; Pl. Ex. 16 (803 Patent) at 6 (Item No. 30, Cutters; Item No. 26, V-Shaped Recesses), 17.  The cutter, however, protrudes out from the rotor slightly farther than the rib, allowing it to be closer to the counter knife, which will "assist in . . . the cutting or the size reduction of the material."  Def. Ex. 3 (Sturm Dep.) at 48:19-50:3; Pl. Ex. 17 (453 Patent) at 4 (Figure 3).  In addition to the point, the cutters have two cutting edges that also interact with the counter knife.  Def. Ex. 3 (Sturm Dep.) at 50:9-12, 68:15-69:1; Pl. Ex. 17 (453 Patent) at 6.

There can be more than one cutter on each rib of the rotor, but they are spaced out such that only one cutter interacts with the counter knife at any given time.  Def. Ex. 3 (Sturm Dep.) at 67:17-68:7, 74:12-16.  On the VAZ 1600 models, there are between 42 and 74 cutters on the rotor, Pl. Ex. 1 (VAZ 1300-1600); Def. Ex. 3 (Sturm Dep.) at 149:16-21, and on the VAZ 1800 models, there can be 84 or more cutters.  Pl. Ex. 2 (VAZ 1800); Def. Ex. 3 (Sturm Dep.) at 165:25-166:12.  The cutters have 4 points so that they can be rotated when the points get dull, allowing a sharper edge to be used to shred or cut the material.  Def. Ex. 10 (Cutters); Def. Ex. 3 (Sturm Dep.) at 79:22-80:8.  The sharp cutters allow the machines to break down the material easier.  Def. Ex. 3 (Sturm Dep.) at 55:18-25.  The cutters, which are mounted on the spinning rotor, are responsible for the size reduction of the material being processed through the machine.  *Id.* at 50:13-16.  That is, most of the size reduction occurs when the material being reduced interacts with the rotor.  *Id.* at 55:18-56:9.



FIG. 1
(Prior Art)

Pl. Ex. 16 (803 Patent) at 4.

As shown above, when in use, material is fed, usually by a forklift or similar device, into what is called the hopper, Pl Ex. 16 (803 Patent) at 3 (Item No. 18, Hopper), 20, and falls onto a horizontal plate at the bottom of the inside of the machine, referred to as the "cutting chamber." Pl. Ex. 16 (803 Patent) at 3 (Item No. 21, Horizontal Plate), 20; Def. Ex. 3 (Sturm Dep.) at 63:23-64:16, 108:22-110:3, 139:6-12; Pl. Ex. 17 (453 Patent) at 2 (Item No. 18, Hopper, Item No. 20 Hydraulic Ram); Pl. Ex. 1 (VAZ 1300-1600); Def. Ex. 4 (Kolbet Dep.) at 107:2-10.  A hydraulic ram, which plaintiff described as a "mechanical pusher," "pushes the material towards the spinning rotor."  Def. Ex. 3 (Sturm Dep.) at 52:16-53:7, 108:22-110:3; Pl. Ex. 17 (453 Patent) at 2 (Item No. 20, Hydraulic Ram); Pl. Ex. 16 (803 Patent) at 3 (Item No. 20, Hydraulic Ram); Pl. Ex. 1 (VAZ 1300-1600).  The purpose of the ram is to get the material close enough to the rotor, and maintain that position, to allow the spinning rotor to do the work of cutting or shredding the material.  Def. Ex. 3 (Sturm Dep.) at 52:25-53:7; Def. Ex. 4 (Kolbet Dep.) at 63:2-16.  The ram itself never hits the rotor.  Def. Ex. 4 (Kolbet Dep.) at 124:16-19.  In addition, there are sensors in the machine that indicate when more material must be fed towards the rotor, and, alternatively, when the system may be overloaded and require the ram to pull back.  Def. Ex. 3 (Sturm Dep.) at 110:17-111:17; Def. Ex. 4 (Kolbet Dep.) at 141:22-143:16.

Ideally, the ram should not exert much pressure on the rotor, just enough for the rotor to grab the material.  Def. Ex. 3 (Sturm Dep.) at 64:17-66:9, 82:18-83:6; Def. Ex. 5 (Beusse Dep.) at 115:4-11 ("[A]ll you're asking the hydraulic ram to do is . . . edge material up to the rotor.").  Indeed, "[s]ome material is just brought near to the rotor, more or less pressure less" while others need "a little pressure against the spinning rotor so that it is grabbed."  Pl. Br. at 18 (citing Def. Ex. 3 (Sturm Dep.) at 65:18-24).  Less pressure is required for the rotor to grab the material if the cutting inserts are newer and sharper.  Def. Ex. 3 (Sturm Dep.) at 65:14-66:9, 82:18-23.  Ideally,

pressure would not be applied to the rotor because that would use more energy and would create heat by friction. *Id.* The only pressure applied by the ram is to the material to move that material towards the rotor. Def. Ex. 4 (Kolbet Dep.) at 63:2-16.

Through the interaction between the rotor and the material, the cutter cuts, shreds or takes scoops out of the material that is being reduced in size. Def. Ex. 3 (Sturm Dep.) at 35:24-36:10; 56:6-9, 62:1-16; Pl. Ex. 17 (453 Patent) at 5-6; Pl. Ex. 16 (803 Patent) at 17-20. Because the cutters often take a scoop out of the material, smaller cutters are used to make the end product smaller. Def. Ex. 3 (Sturm Dep.) at 62:1-16 ("[T]he scoop that pours out of the solid block" or "natural bite of the cutter" would be smaller with a smaller cutter.); Def. Ex. 4 (Kolbet Dep.) at 57:23-58:14. With respect to the VAZ 1600 and 1800 lines, the smallest and most often used cutter is the 40 mm cutters. Def. Ex. 3 (Sturm Dep.) at 61:10 to 62:22.

Once material is reduced to a small enough size, the material would then pass through the space between the rotor and the counter knife. Pl. Ex. 17 (453 Patent) at 5, 6; Def. Ex. 3 (Sturm Dep.) at 52:25-53:12. The material that is fed into this space is also "cut" by the cutters as they mesh with the counter knife and additional size-reduction of the material takes place. Pl. Ex. 17 (453 Patent) at 5, 6; Pl. Ex. 16 (803 Patent) at 17-18, 20; Def. Ex. 4 (Kolbet Dep.) at 76:2-20; Def. Ex. 5 (Beusse Dep.) at 67:6-17. The patent describes the interaction between the v-cutter and the counter knife as having a "scissoring" effect because the cutting edge of the cutter has a concave shape and each part of the cutting edge hits the counter knife at different times so it can cut like a scissor. Pl. Ex. 17 (453 Patent) at 6; Pl. Ex. 16 (803 Patent) at 18; Def. Ex. 3 (Sturm Dep.) at 70:2-71:3, Def. Ex. 5 (Beusse Dep.) at 69:19-70:10. Indeed, in its ideal form, when cutters are sharp, and the cutting tolerance (*i.e.*, the space between the rotor and the counter knife which is often .01 to .03 inches) remains narrow, material is cut or shred when it passes the

9

counter knife.  Def. Ex. 4 (Kolbet Dep.) at 78:25-79:10, 174:9-175:21; Def. Ex. 3 (Sturm Dep.) at 157:4-17; Def. Ex. 5 (Beusse Dep.) at 108:10-22.  Like the cutters, the counter knife can be rotated if it becomes dull.  Def. Ex. 3 (Sturm Dep.) at 85:9-18.

To eliminate stringy or fibrous material wrapping around the rotor, machines can be equipped with flat cutters.  *Id.* at 56:14-58:8.  These flat cutters are the improvement described in the 453 Patent, invented by Mr. Sturm.  *Id.* at 42:3-7, 56:14-58:14; Pl. Ex. 17 (453 Patent); Def. Ex. 11 (Film Fiber).  Stringy material, or highly flexible tensile plastic material, tends to "wrap around the rotor in areas where no cuts can take place," which is in the valleys of the rotors.  Def. Ex. 3 (Sturm Dep.) at 56:14-58:8.  Flat cutters can be installed in each of the valleys of the rotor on either the VAZ 1600 or the VAZ 1800 models.  *Id.* at 147:3-10; Pl. Ex. 17 (453 Patent) at 6.  The flat cutter has a "substantially flat or straight cutting edge . . . that is generally parallel to the axis of the rotor."  Pl. Ex. 17 (453 Patent) at 6.  According to the patent, "the cutting edge cooperates with a flat or straight end edge . . . of the corresponding tooth of the counter knife to cut material located between axially adjacent v-cutters."  *Id.*  That is, flat cutters require a special rotor and corresponding counter knife that has certain flat edges.  Def. Ex. 3 (Sturm Dep.) at 41:8-16, 58:15-20.  "Any stringy material that may tend to lay in the valleys of the rotor will be cut by the flat cutters."  Pl. Ex. 17 (453 Patent) at 6; Def. Ex. 3 (Sturm Dep.) at 72:3-12.  Shredding of seatbelts, for example, would benefit from the addition of the flat cutters.  Def. Ex. 3 (Sturm Dep.) at 90:25-91:10.  Like the v-cutters, the flat cutters can be rotated if an edge becomes dull.  Pl. Ex. 17 (453 Patent) at 6.

The process for reducing the size of each material can vary slightly depending on the type of material being reduced.  For example, paper is basically ripped apart by the machine.  Def. Ex. 3 (Sturm Dep.) at 92:13-20; Pl. Ex. 15 (Letter) at 14.  Other materials, like seatbelts, are torn or

cut, Def. Ex. 4 (Kolbet Dep.) at 184:16-20, and still others, like a bowling ball, are broken or scooped out by the cutters. *Id.* at 265:2-22.

Although not required, there is often a screen surrounding the rotor, which is equipped with various sized openings, ranging in size from 3/8 inch in diameter to six inches in diameter. Def. Ex. 3 (Sturm Dep.) at 60:4-24; Pl. Ex. 1 (VAZ 1300-1600) at 3; Pl. Ex. 15 (Letter) at 16-20. When a screen is used, the material that passes through the space between the rotor and the counter knife (after the material has been cut/shredded/scooped by the rotor and cut by the counter knife) has to be small enough to pass through the opening in the screen. Def. Ex. 3 (Sturm Dep.) at 51:9-52:15, 60:4-24; Pl. Ex. 17 (453 Patent) at 5. If the material being reduced is not small enough to pass through the screen, it would move back to the cutting chamber to be reduced in size again by the rotor. Def. Ex. 3 (Sturm Dep.) at 51:21-52:15; Pl. Ex. 17 (453 Patent) at 5. The size of the output material that is produced by the machines can vary depending upon the size of the cutters (40 mm for the VAZ 1600 and either 40 mm or 60 mm for the VAZ 1800), Def. Ex. 3 (Sturm Dep.) at 149:3-21, 166:9-25, the size of the screens, *see supra*, and the variety of material being reduced. *See* Pl. Ex. 15 (Letter) at 7-14. Typically, the size of the output material that is produced by the machine after size reduction can vary from 1 to 3 inches, or sometimes larger. Def. Ex. 4 (Kolbet Dep.) at 230:9-22. Because the material is not pulverized, the identity of the material can often still be determined after the size reduction process. Def. Ex. 3 (Sturm Dep.) at 87:10-89:12; Pl. Ex. 15 (Letter) at 7-14. And, depending on the shape of the material, larger pieces can make it through a screen as small as 1 inch. *Id.*

When in operation, the rotor in the VAZ 1600 and 1800 lines of machines moves at a low speed, but with high torque. Def. Ex. 3 (Sturm Dep.) at 131:15-25; Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800). The low speed is in reference to the speed at which the rotor spins,

measured in rotations per minute. Def. Ex. 3 (Sturm Dep.) at 131:15-132:11, 149:22-150:1. The rotation speed of the rotors in the VAZ 1600 and 1800 machines generally does not exceed 200 rpm, with most spinning at approximately 140 rpm. Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800); Def. Ex. 4 (Kolbet Dep.) at 117:2-15. Machines with the high torque drive are adjustable in terms of speed. Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800); Def. Ex. 3 (Sturm Dep.) at 154:17-155:24. Torque is the force at which the motor turns, and the power of the machine is equivalent to speed times torque. Def. Ex. 3 (Sturm Dep.) at 131:4-14. The horsepower of the rotors range from 75-150 Hp for the VAZ 1600 models, and up to 200 Hp for the VAZ 1800 models. Def. Ex. 3 (Sturm Dep.) at 152:15-153:23; Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800). By comparison, the horsepower in the feeding system, or the ram, is 10.2 Hp. *Id.*

The low spinning speed of the rotors for the machines makes them more efficient, meaning the energy is used to reduce the materials using the cutters, rather than to create friction, which is more common for fast spinning machines. Def. Ex. 3 (Sturm Dep.) at 131:18-25. Slower spinning rotors, such as the ones at issue, produce more coarse, uniform size output, which results from the natural bite of the cutters. *Id.* at 132:1-11, 151:4-12. Therefore, the purpose of low speed, high torque is to "use the cutters to cut or scoop out material instead of just shatter something or have the impact . . . ." *Id.* at 133:5-12. The machines are not intended to crush material. *Id.* Powder, either fine or particle size, is not the desired output for the VAZ 1600 and VAZ 1800 lines of machines. Def. Ex. 3 (Sturm Dep.) at 132:12-24; Def. Ex. 4 (Kolbet Dep.) at 186:4-11. The fine materials could cause problems downstream; for example, it could harm the health and safety of those in contact with the fine materials or the fine materials could have explosive qualities. Def. Ex. 3 (Sturm Dep.) at 132:12-24.

The differences between the VAZ 1600 and the VAZ 1800 lines of machines often relate to the size of the machine itself.  Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800).  While both the VAZ 1600 and the VAZ 1800 lines of machines are capable of reducing the same range of materials, the VAZ 1800 machines are larger, the opening and volume of the hopper are bigger, the length and diameter of the rotor are larger (20 inch diameter for the 1800 as compared to 15 inches for most 1600s), and the rotor is equipped with more cutters.  *Id*.; Def. Ex. 3 (Sturm Dep.) at 164:3-21.  Because the rotor is bigger and approximately a third of the rotor is exposed in the cutting chamber, the VAZ 1800 line of machines offer a larger surface to cut the material as compared to the VAZ 1600 line of machines.  Def. Ex. 3 (Sturm Dep.) at 164:22-165:24.

## QUESTION PRESENTED

The parties agree that the imported shredders are classified under heading 8479, HTSUS, which covers "[m]achines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter . . . ."  The question before the Court is whether the imported goods are properly classified under subheading 8479.82.00 as "[o]ther machines and mechanical appliances: . . . [m]ixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines," or whether they are properly classified under subheading 8479.89.94, HTSUS, which covers, "[o]ther machines and mechanical appliances: . . . other: . . . other."

## SUMMARY OF ARGUMENT

Plaintiff claims that the merchandise should be classified in subheading 8479.82.00. However, to be classified in this provision, plaintiff must show that the principal function of the imported shredders is either "[m]ixing, kneading, crushing, grinding, screening sifting,

homogenizing, emulsifying or stirring."  The undisputed facts show that none of these processes reflect the principal function of the imported machines.

Because the merchandise is not properly classified in subheading 8479.82.00 (or any other subheading of heading 8479), the machines must be classified in subheading 8479.89.94, HTSUS, which covers, "[m]achines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof; [o]ther machines and mechanical appliances: . . . other: . . . other."

## ARGUMENT

## I.   SUMMARY JUDGMENT FOR THE GOVERNMENT IS WARRANTED

The Court reviews classification decisions by Customs *de novo* through a two-step analysis.  *Faus Group, Inc. v. United States*, 581 F.3d 1369, 1371 (Fed. Cir. 2009).  First, the Court must determine "the proper meaning of the relevant tariff provisions" – a question of law. *Id.* (citing *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).  Second, the Court must determine "whether the merchandise at issue falls within a particular tariff provision as construed" – a question of fact.  *Id.* at 1371-72.

"This court may resolve a classification issue by means of summary judgment . . . 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . .'"  *Essex Mfg., Inc. v. United* States, 30 CIT 1, 3 (2006) (quoting USCIT Rule 56(c)).  That is, the Court must determine whether there are any factual disputes that are material to the resolution of the action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Trade 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990).

Because there are no material factual issues in dispute, this case is ripe for summary

judgment.

## II.     THE SUBJECT MERCHANDISE IS NOT PROPERLY CLASSIFIED UNDER SUBHEADING 8749.82.00, HTSUS

### A.   Interpretive Rules

In construing the tariff statute, the Court applies the General Rules of Interpretation

(GRIs), which are applied in numerical order, *BASF Corp. v. United States*, 482 F.3d 1324,

1325-26 (Fed. Cir. 2007), and, if applicable, the Additional U.S. Rules of Interpretation (ARIs).

*Id.; Lerner New York, Inc. v. United States*, 908 F. Supp. 2d 1313, 1318 (Ct. Int'l Trade 2013).

GRI 1 provides that "classification [under a particular heading] shall be determined according to

the terms of the headings and any relative section or chapter notes . . . ."  The HTSUS section

and chapter notes "are not optional interpretive rules," but instead have the force of statutory

law.  *Aves. in Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (internal

quotation marks omitted).  GRI 6 provides that "the classification of goods in the subheadings of

a heading shall be determined according to the terms of those subheadings and any related

subheading notes . . . ."

### B.   The VAZ 1600 And VAZ 1800 Lines Of Industrial Shredders Are Not Properly Classified Under Subheading 8749.82.00, HTSUS, Because Their Principal Function Is Not "Grinding," "Crushing" or "Screening"

The parties agree that the machines are properly classified in heading 8479, HTSUS,

which covers "[m]achines and mechanical appliances having individual functions, not specified

or included elsewhere in this chapter . . . ."  Plaintiff claims that the merchandise is properly

classified under subheading 8479.82.00 as "[o]ther machines and mechanical appliances: . . .

[m]ixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring

machines."[4]  Compl. ¶ 28.  Conversely, the Government maintains that the merchandise is properly classified under subheading 8479.89.94, HTSUS, which covers, "other machines and mechanical appliances: . . . other: . . . other."

Subheading 8479.82.00 enumerates several processes: "[m]ixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring."  When considering whether the imported merchandise should be classified under one of the processes of this subheading, the tariff requires a consideration of the principal function and the principal purpose of the machine.

Note 3 to Section XVII provides:

> Unless the context otherwise requires, composite machines consisting of two or more machines fitted together to form a whole and other machines designed for the purpose of performing two or more complementary or alternative functions are to be classified as if consisting only of that component or as being that machine which performs the principal function.

*Id.*

Similarly, Note 7 to Chapter 84 provides that "a machine which is used for more than one purpose is, for the purpose of classification, to be treated as if its principal purpose were its sole purpose."

Plaintiff alleges that the primary function of the imported shredders is "crushing," "grinding," or "screening."  Pl. Br. at 3, 13.  The tariff statute does not define these terms.  When the statute leaves terms undefined, the terms "are construed according to their common [and] commercial meanings."  *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (internal quotation marks omitted).  To ascertain the "common and commercial meanings" of a

---

[4] Plaintiff does not contend that the function of the machines is either "[m]ixing," "kneading," "sifting," "homogenizing," "emulsifying" or "stirring."  We agree that these terms do not describe the function of the machines and, therefore, do not further discuss these terms of the HTSUS.

particular tariff term, the Court "may rely on its own understanding of the term as well as upon lexicographic and scientific authorities." *Len-Ron Mfg. Co., Inc.  v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  That is, the "court may consult dictionaries, scientific authorities, and other reliable information sources." *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

  We set forth the common meaning of each of these terms below.  The undisputed facts show that the principal function of the imported shredders is not reflected by "crushing," "grinding," or "screening" or any of the processes enumerated under subheading 8479.82.00.  Therefore, the merchandise is properly classified under subheading 8479.89.94.

## 1.  The Machines Are Not "Grinding" Machines

  The Merriam-Webster Dictionary defines the verb "grind" as "1: to reduce to powder or small fragments by friction . . . 2: to wear down, polish, or sharpen by friction . . . ."  Def. Ex. 12 (Merriam-Webster Online Dictionary) at 30.  Similarly, the Cambridge Dictionary defines "grind" as "to make something into small pieces or a powder by pressing between hard surfaces . . . ."  Def. Ex. 13 (Cambridge Dictionary) at 31; *see also* Def. Ex. 14 (Collins Dictionary) at 21 (defining "grind" as meaning to "crush . . . between two hard surfaces or with a machine until it becomes a fine powder" or to "press and rub it hard into the surface using small circular or sideways movements" as with a cigarette); Def. Ex. 15 (Macmillan Dictionary) at 2 (defining "grind" as "to break something into very small pieces or powder, by using a machine or by crushing it between two hard surfaces"); Def. Ex. 16 (The RandomHouse College Dictionary 581 (1972) ("1. to wear, smooth, or sharpen by abrasion or friction . . . 2. to reduce to fine particles, as by pounding or crushing; to pulverize.")).  The term "particle" is defined as "1a: a minute quantity or fragment, b: a relatively small or the smallest discrete portion or amount of

something," Def. Ex. 12 (Merriam-Webster Online Dictionary) at 40, or "an extremely small piece of something such as dust, dirt, or sand." Def. Ex. 13 (Cambridge Dictionary) at 42. Consistent throughout these definitions is both a description of the process, characterized by the use of pressure, force or friction between hard surfaces, and the end result or output material from the "grinding" process, described as material broken down into very small pieces, particles or powder.

The definitions of "grind" cited by plaintiff are consistent with the ones cited above. *See* Pl. Br. at 6-7. For example, plaintiff references the American Heritage Dictionary of the English Language (1975), which defines "grind" as "1. a. to crush, pulverize, or powder with friction, especially by rubbing between two hard surfaces . . . . b. To shape, sharpen, or refine with friction . . . . 2. To rub (two surfaces) together; gnash . . . 3. To bear down on harshly; crush." Pl. Br. at 6; Pl. Ex. 3 (Am. Heritage Dictionary of the English Language 579-80 (1975)). Citing the same dictionary, plaintiff notes that "grind" is synonymous with "pulverize," which is defined as "To pound, crush or grind to powder or dust." Pl. Br. at 6-7; Pl. Ex. 3 (Am. Heritage Dictionary of the English Language 1059). Plaintiff further cites Webster's New World Dictionary, Third College Edition, which defines the term "grind" as "to crush into bits or fine particles between two hard surfaces; pulverize." Pl. Br. at 7; Pl. Ex. 3 (Webster's New World Dictionary 594 (1988)).

Under either parties' definition of this term, the machines at issue do not "grind," for two reasons. First, the processing of material through the imported shredders does not use pressure, force or friction to cut the material. Indeed, aside from reference to "friction," which results from stringy material wrapping around the rotor, Pl. Ex. 17 (453 Patent) at 5, 6, a problem alleviated by the 453 Patent with invention of the flat cutters, neither of the patents use the

phrases force or pressure or friction in describing the operation of the machines.  Pl. Ex. 17 (453 Patent); Pl. Ex. 16 (803 Patent).  Further, plaintiff testified (through its designated agent Mr. Kolbet) that the only pressure exerted within the machine is when the ram moves material towards the rotor, Def. Ex. 4 (Kolbet Dep.) at 63:2-16; *see also* Def. Ex. 3 (Sturm Dep.) at 64:17-66:9, 82:18-83:6; Def. Ex. 5 (Beusse Dep.) at 115:4-11.  Plaintiff also testified that the ram is not intended to push the material against the rotor such that it exerts pressure on the rotor.  Def. Ex. 3 (Sturm Dep.) at 64:17-66:9.  The ram is supposed to move the material that is dropped into the cutting chamber closer to the rotating rotor (and cutting inserts),  *id.* at 52:25-53:7; Def. Ex. 4 (Kolbet Dep.) at 63:2-16, so that the rotor can act upon the material, first by being cut, shred, or scooped out by the cutters, and then through the interaction between the rotor and the counter knife as material passes through the narrow space between them.  Def. Ex. 3 (Sturm Dep.) at 35:24-36:10; 56:6-9; 62:1-16; Pl. Ex. 17 (453 Patent) at 5-6; Pl. Ex. 16 (803 Patent) at 17-20; Def. Ex. 4 (Kolbet Dep.) at 76:2-20; Def. Ex. 5 (Beusse Dep.) at 67:6-17.  The machines specifically do not operate by using friction; instead, the low speed, high torque machines operate by allowing the cutters to reduce the material.  Def. Ex. 3 (Sturm Dep.) at 131:18-25.

Moreover, neither the patents nor the product brochures indicate that the machine's operation involves the rubbing of hard surfaces.  Pl. Ex. 17 (453 Patent); Pl. Ex. 16 (803 Patent); Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800).  Additionally, Vecoplan does not describe the function of the imported machines as the rubbing of hard surfaces, either through the testimony of its designated agent or within its brief.  Therefore, the terms "grind" or "grinding" do not accurately describe the process performed by the imported shredders.

Second, as reflected in the definitions above, the process of "grinding" results in powder, particles or very small pieces or material, and the size of the material being produced by the

imported machines cannot be described as powder, particles or very small pieces.  The definitions advanced by plaintiff define "grind" as to pulverize, which means to reduce to powder or dust.  This is not what occurs to the material that is being shredded through the imported machines.  In fact, Vecoplan witnesses indicated that the size of the end product produced by the imported merchandise is often between 1 to 3 inches, or more, and the witnesses testified that the machines at issue do *not* pulverize the material.  *See e.g.*, Def. Ex. 4 (Kolbet Dep.) at 230:9-22; Def. Ex. 3 (Sturm Dep.) at 87:10-89:12; Pl. Ex. 15 (Letter) at 7-14.  Indeed, it is *not* the goal of the machines at issue to reduce the size of the material to powder.  Def. Ex. 3 (Sturm Dep.) at 132:12-24; Def. Ex. 4 (Kolbet Dep.) at 186:4-11.  As Mr. Sturm testified, powder-like material could cause problems both for the machine and for the health and safety of those operating the machine and could have explosive qualities.  Def. Ex. 3 (Sturm Dep.), 132:12-24.

It is a different machine, a granulator, with a faster spinning rotor, that may be capable of reducing the material to small, powder or pellet-like pieces.  *Id.* at 132:1-11, 135:23-136:14; Def. Ex. 4 (Kolbet Dep.) at 101:5-102:19, 234:7-235:21; Def. Ex. 5 (Beusse Dep.) at 135:18-136:13, 137:5-25.  Faster spinning rotors (often equipped with blades not cutters), can spin as fast as 1200 or 1800 rpm.  Def. Ex. 3 (Sturm Dep.) at 135:23-136:1, 151:18-24; Def. Ex. 4 (Kolbet Dep.) at 234:7-235:21.  These fast spinning machines operate differently and produce more "fine" materials.  Def. Ex. 3 (Sturm Dep.) at 132:1-11, 136:2-14.  Indeed, a granulator can produce powder or pellet size material, which can range from 1/8 inch to an inch; and, a granulator can be used for the secondary reduction of the material after it is initially reduced by the shredder.  *Id.* at 132:1-11, 135:23-136:14; Def. Ex. 4 (Kolbet Dep.) at 101:5-102:19, 234:7-235:21; Def. Ex. 5 (Beusse Dep.) at 135:18-136:13, 137:5-25.  Again, powder, either fine or

particle size, is not the desired output for the VAZ 1600 and VAZ 1800.  Def. Ex. 3 (Sturm Dep.)
at 132:12-24; Def. Ex. 4 (Kolbet Dep.) at 186:4-11.

Instead of "grinding," the principal function of the machine is to reduce material to a
particular and consistent size through shredding or cutting.  The verb to "cut" is defined, in
relevant part, as "1 a : to penetrate with or as if with an edged instrument . . .  c : to strike sharply
with a cutting effect . . . .3 b (1) ; to divide into parts with an edged tool."  Def. Ex. 12 (Merriam-
Webster Online Dictionary) at 13-14.  Similarly, the Cambridge Dictionary defines to "cut" as
"to break the surface of something, or to divide or make smaller, using a sharp tool, especially a
knife."  Def. Ex. 13 (Cambridge Dictionary) at 9.  Shred is defined as "to cut or tear into shreds,"
or long narrow strip.  Def. Ex. 12 (Merriam-Webster Online Dictionary) at 58-59; *see also W.R.
Grace & Co. v. United States*, 19 C.C.P.A. 326, 329 (1932) (applying two dictionaries that
define the term "shred" as "to tear, *cut* or separate into small irregular or jagged strips or pieces;
reduce to long and narrow fragments, as fibrous material" and "to *cut* or tear into small pieces;
also, to *cut* or tear pieces from . . . ." (emphasis in original)).

Plainly, the principal function of the machines can be described as cutting or shredding,
as those terms are defined by their common meaning, and as the operation of the machines is
characterized throughout the relevant patents, and by Vecoplan.  *See* Pl. Ex. 1 (VAZ 1300-1600);
Pl. Ex. 2 (VAZ 1800); Pl. Ex. 17 (453 Patent); Pl. Ex. 16 (803 Patent).  Indeed, the machines at
issue uses an edged instrument, a cutter, to penetrate and divide the material into coarse pieces.
That cutter also interacts with the counter knife to further cut the material when it passes through
the space between them.  *See supra* at 5-13.  The operation of the machine can plainly be
characterized as cutting.  Moreover, the material reduced in the shredder is also cut, ripped or
torn into small pieces, similarly satisfying the definition of shredding.

Plaintiff argues that shredding does not properly identify the functioning of the machines. *See e.g.*, Pl. Br. at 16-17, 21-22.  In reaching that conclusion, plaintiff's witnesses compared the machine at issue to a different machine that they considered a "conventional shredder," Def. Ex. 5 (Kolbet Dep.) at 165:7-166:1, Def. Ex. 5 (Beusse Dep.) at 32:20-33:21; *see also* Pl. Br. at 22. Mr. Kolbet, as a result, defined the term "shredding" as involving a "cutting action that takes a starting material and reduces it to small thin strips via the action of two cutting blades or surfaces which act in tandem . . . to cut the material into defined edges along the cutting surface such that a clear line can be observed along the edges of the resulting strip."  Def. Ex. 5 (Kolbet Dep.) at 160:22-161:21.  Shredding, however, is not limited to plaintiff's narrow definition.  *See supra* at 20.  Therefore, any conclusion by plaintiff that the machines do not shred is not supported by the plain meaning of the term.

That the term "grind" and "ground" each appear one time in each of the patents does not support the conclusion that the principal function of the machines is "grinding."  Pl. Br. at 24. The 453 Patent and the 803 Patent describe the operation of the machines as cutting or shredding in many more instances.  Pl. Ex. 17 (453 Patent), Pl. Ex. 16 (803 Patent).  Indeed, in comparison to the single mention of the terms "grind" and "ground," the terms shred/shredder/shredding/shredded appear 44 times in the 453 Patent and 56 times in the 803 Patent.  And the terms cutter/cutting/cut/cutting edge/cutting vertex appear 161 times in the 453 Patent and 346 times in the 803 Patent.  *Id.*

Therefore, with respect to the machines at issue, neither the function of the machine, nor the size of the material that is produced by the machine, are reflective of the process of "grinding."

## 2. <u>Plaintiff's Interpretation Of The Term "Grinding" Is Unpersuasive</u>

Plaintiff argues that the common meaning of "grinding" includes all (or most) processes used to reduce the size of material and covers all sizes of the output material that result from those methods.  Pl. Br. at 5-6, 10-11.  Specifically, plaintiff erroneously concludes that "a grinder is a machine that breaks input material into relatively smaller 'bits or fine particles.'"  Pl. Br. at 7.  This analysis is broader than the common meaning reflected in the dictionaries and is, therefore, unavailing.[5]

In support of its analysis, plaintiff references *United States v. Colonial Commerce Co.*, 44 CCPA 18 (1956) and *Crown Cork & Seal Co., Inc. v. United States*, 65 Cust. Ct. 483 (1970), two non-binding decisions that interpret the term "ground" found in the statutes preceding the current tariff code.  These decisions do not depart from the common meaning of terms discuss above.

The Court in *Colonial Commerce*, for example, analyzed Paragraph 781 of the Tariff Act of 1930, which covered "spices and spice seeds," to determine whether imports of sage were in the state of being "ground."  First, the Court concluded that the determination should include consideration of not only the fineness of the resulting particle, but the process that reduced the size of the material.  *Id.* at 19-20.  The Court held that "grinding is necessarily a physical process *involving the application of friction, or crushing,* to the material at hand" and that it could cover a "variety of processes by which materials are divided up into relatively small particles."  *Colonial Commerce*, 44 C.C.P.A. at 20 (emphasis added); *see* Pl. Br. at 5-6.  We agree with this description, but this description cannot be interpreted to cover every process that divides material

---

[5] The definition put forward by plaintiff's designated agent, Mr. Kolbet, is similarly overbroad in that it defines "grinding" as reducing "the size of a piece of material to a smaller size, size reduction, like crushing or scooping . . . to reduce the size of that material."  Def. Ex. 4 (Kolbet Dep.) at 57:13-22.  He further states that ripping may also be included within this definition.  *Id.* at 151:9-152:18.

into small particles.  And nothing in the Court's decision indicates that it intended for that type of broad interpretation.  To be sure, the *Colonial Commerce* Court clarified (1) that, as it pertains to an earlier decision of the Court, the term "ground" means material "reduced to a fine condition or powder *by crushing and friction*," and (2) that the earlier decision "d[id] not hold that a finely divided powder produced *in any way* whatever is to be considered ground."  *Colonial Commerce*, 44 C.C.P.A. at 20 (emphasis added).  That Court observed, for example, that powder resulting from "precipitation" cannot be considered "ground."  *Id*.  The "variety of processes" that can result in material being "ground," then, is necessarily limited.  *Id*.

Our interpretation of the term "grind" is therefore consistent with the holding in *Colonial Commerce*.  The sage had gone through a "frictional or rubbing process," *id*. at 21, during which the sage was forced through wire openings that were 1/8 inch in diameter.  *Id*. at 19.  As the Court noted, "there is nothing in the nature of the process" that precluded classification of the material as "ground sage"; indeed, it involved the necessary "friction, or crushing."  *Id*. at 20-21.  Our interpretation of the term is further consistent with the Court's holding that the coarse sage was small enough to be considered "ground."  Although the Court refrained from setting a specific size limitation for material that has been "ground," the definitions discussed both by the Court *Colonel Commerce* and by our brief "contemplate reduction to small particles *or* to powder."  *Id*. at 21 (emphasis in original).  And a "particle," which is a "minute fragment" comparable to "dust, dirt or sand," *see supra* at 18, describes material fitting into 1/8 inch diameter opening.  The analysis in *Colonel Commerce*, therefore, does not support plaintiff's broad interpretation of the term "grinding."

Turning to *Crown Cork & Seal*, in that case, the Customs Court reviewed the tariff classification of "irregular shaped cork particles of various sizes . . . generally of one-half inch in

24

the longest linear dimension." *Crown Cork & Seal*, 65 Cust. Ct. at 484.  The Court considered

whether the merchandise should be classified as "cork, granulated or ground" under item 220.10

or 220.15 of the Tariff Schedule of the United States (another predecessor statute to the current

tariff code).  *Id.*

In interpreting the term "ground" from item 220.15, the Court considered the process by

which the cork was reduced in size.  The process was called "breaking," and it involved "a 'bale

breaker' with swinging hammers and grate bar at the bottom."  *Id.* at 487.  The "swinging

hammers hit a striking bar, and the cork, and they in turn cut it or reduce it in size and at the

same time, by using a swinging hammer mill you continually are bouncing off of this cork and

loosening the hardback and bark from it . . ."  *Id.*  Citing *Colonel Commerce*, that Court held that

"grinding" "is broad enough to cover a variety of processes by which materials are divided into

relatively small particles," and then included "breaking, crushing, cutting or pulverizing."  *Id.* at

496.  The Court, however, also noted that "grinding" was "a physical process involving the

application of friction, or crushing," necessarily limiting the "grinding" process to those

involving "friction, or crushing."  *Id.* at 495.  Our interpretation of the term "grind" is consistent

with the Court's interpretation of the term "ground" in *Crown Cork & Seal*.  The imported cork

in *Crown Cork & Seal* was reduced in size using swinging hammers and a grate bar and the end

product resulted in, at most, half inch pieces of cork.  Although the Court found this product to

be "ground," the Court did not interpret the process of "grinding" to include every process of

size reduction, or every size of output material that results from that reduction process.

Plaintiff then argues that no distinctions should be drawn among the processes of cutting,

tearing/tearing/shredding and "crushing" or "grinding".  Pl. Br. at 10.  The distinctions between

the processes, however, are apparent from the common meaning of those terms.  *See BenQ Am.*

*Corp.*, 646 F.3d at 1376; *Len-Ron Mfg. Co., Inc*, 334 F.3d at 1309.  The process of "grinding" reduces the size of material through force, pressure or friction.  The process of "crushing," on the other hand, reduces the size of material by squeezing or pressing the material together to destroy its shape.  *See infra* at 28-28.  "Grinding" and "crushing" are distinct processes from one another, as are cutting and shredding, *see supra* at 20-21.  That the dictionary definitions for these terms do not specifically say that they are distinguishable amongst themselves does not mean the terms are synonymous.[6]

Finally, plaintiff has submitted printouts from websites, Pl. Br. at 11-12 & Exs. 5-10, purporting to show machines called "grinders," that include cutting surfaces.  As a threshold matter, the Court should disregard this material as plaintiff has failed to show that these websites or information can be presented in a form that would be admissible in evidence.  *See* USCIT Rule 56(c)(2) (describing when a party may object for a fact not being supported by admissible evidence).  Plaintiff has failed to put forward a witness with personal knowledge of these machines that could lay the necessary evidentiary foundation for this information.  But even if the Court were to consider the machines from the internet in its analysis, these machines do not support plaintiff's interpretation of the disputed tariff terms.  First, that a cutting edge is found within a machine does not establish that machine performs the process of "grinding," nor does it exclude the machine from being considered a "grinding" machine.  Rather, plaintiff must show how the cutting edges perform the process of "grinding," as interpreted by the common meaning of that term.  And again, there is no information on the record of this case, presented in a form that would be admissible, that establishes how these machines operate.  Specifically, it is not clear if the machines use friction, force or pressure to reduce the size of material, or if the output

---

[6] Plaintiff's designated agent testified that the terms are "interchangeable."  Pl. Br. at 24.  But the common meaning of the terms, as defined by dictionaries, shows that view to be erroneous.

material from that process is of any particular size, all of which must be considered.  Second, the commercial name for the machines – "grinders" – does not reveal or establish the principal function of a machine.

Therefore, plaintiff's overly broad interpretation of the term "grinding" that includes all (or most) processes used to reduce the size of material and covers all sizes of the output material that result from those methods is without support.

### 3.   The Machines Are Not "Crushing" Machines

Like "grinding," the imported shredders do not perform the function of "crushing."  The Merriam-Webster Dictionary defines "crush" as "1a: to squeeze or force by pressure so as to alter or destroy structure . . . b: to squeeze together into a mass . . . 2: to reduce to particles by pounding or grinding."  Def. Ex. 12 (Merriam-Webster Online Dictionary) at 3.  Similarly, the Cambridge Dictionary defines "crush" as "to press something very hard so that it is broken or its shape is destroyed."  Def. Ex. 13 (Cambridge Dictionary) at 1; *see also* Def. Ex. 14 (Collins Dictionary) at 3 (defining "crush" as "to press it very hard so that its shape is destroyed or so that it breaks into pieces").  Like "grind," force and pressure are necessary to "crush" material, but during "crushing," that force or pressure is used to squeeze the material together to reduce it to particles (destroying its shape) or to create a mass of material.  As with "grinding," neither the function of the imported machines, nor the size of the output material that is produced by the imported machines, are reflective of the process of "crushing."  Indeed, the function of the imported machines does not involve the squeezing of material between two opposing bodies or the exertion of "very hard" pressure to alter or destroy the material.  While the machines may destroy the shape of the material being processed, they neither "crush" pieces of the material together, nor do they reduce the material to particles, as is anticipated by the common meaning

of the term "crush."  Moreover, the relevant patents never describe the function of the machines as "crushing."  Pl. Ex. 17 (453 Patent); Pl. Ex. 16 (803 Patent).  Therefore, like "grinding," "crushing" does not describe the operation of the machines.

The dictionary definitions of the term "crush" or "crushing" within plaintiff's briefing are consistent with the definitions cited herein.  *See* Pl. Br. at 7 (citing the definition of "crush" from The American Heritage Dictionary of the English Language as "[t]o press between opposing bodies so as to break or injure; mash; squeeze.  2. To break, pound, or grind . . . into small fragments or powder.").  However, plaintiff fails to properly apply these definitions.  Instead, it applies a definition that uses the terms "impact and shatter,"  Pl. Br. at 7, as defined by Mr. Beusse.  Def. Ex. 5 (Beusse Dep.) at 129:12-130:9.  Consequently, like "grinding," plaintiff's interpretation of "crushing" is inconsistent with the plain meaning of the relevant terms.

Plaintiff further argues that "[g]rinding and crushing are related in that the purpose of both is to reduce the size of the input material."  Pl. Br. at 7.  Indeed, throughout the brief, plaintiff interprets "grinding" and "crushing" in the same manner – to mean, essentially, size reduction.  Plaintiff states that the definitions for the relevant terms "reflect the common meaning that crushing and grinding machines are a general category of equipment that demolish input by applying a harsh force to break them to relatively small fragment, bits or particles."  Pl. Br. at 8.  Plaintiff then identifies the range of possible mechanisms of reduction including "friction, abrasion, crushing force, pounding, pulverizing *or other means as in, but not limited to*, a mill, or mortar, or with teeth."  Pl. Br. at 8 (emphasis added).  However, "grinding" and "crushing" are separate tariff terms that reflect separate operations.  And, the fact that Congress chose the terms "grinding" and "crushing" for the tariff statute instead of the more general phrase "size-reduction" shows that Congress intended for those terms to have different

meanings.  It is a settled rule of statutory interpretation that, "[w]hen interpreting HTSUS provisions, we must strive to give effect to every word in the statutory text." *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013); *see also Marx v. General. Revenue Corp.,* 567 U.S. 371, 386 (2013) (explaining that "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme").  Plaintiff violates this rule by interpreting the terms in the same manner.

### 4.   <u>"Screening" Is Not The Principal Function Of The Machines</u>

Finally, while the machines may screen material, that function is not the principal function of the machines because the "screening" function is ancillary to the shredding or cutting process that reduces the size of the material during the operation of the machines.  The Merriam Webster Dictionary defines the verb "screen" or "screening" as "3a: to pass (something such as coal, gravel, or ashes) through a screen to separate the fine parts from the coarse . . . b(1): to examine usually methodically in order to make a separation into different groups (2): to select or eliminate by a screening process . . . ."  Def. Ex. 12 (Merriam-Webster Online Dictionary) at 49-50.  Similarly, Collins Dictionary defines to "screen" as "14. to separate, conceal, shelter, or protect, with or as with a screen" or "16. to sift through a coarse mesh so as to separate finer from coarser parts."  Def. Ex. 14 (Collins Dictionary) at 42.  Here, although screens are often installed in the machines to separate the material by size, and this separation process can be described as "screening," the principal function of the machine is not the act of "screening."  The principal function of the machine is to reduce material to a particular and consistent size through shredding or cutting, and the function of the screen is to sort and separate material and return larger pieces to the cutting chamber for further size reduction until such time as the material can pass through the screen openings.

### 5.  The Rule Of Commercial Designation Does Not Apply To This Case

Finally, plaintiff appears to claim that the Government is making a "commercial designation" argument by defining the terms "grinding" and "crushing" by reference to lexicographic sources.  Pl. Br. at 12-13.  Not so.  The rule of commercial designation applies when a party "argues that a term in the tariff should not be given its common or dictionary meaning." *Rohm & Haas Co. v. United States*, 727 F.2d 1095, 1097 (Fed. Cir. 1984)).  In that instance, the party "must prove that there is a different commercial meaning in existence which is definite, uniform, and general throughout the trade" – *i.e.*, that the product has a particular "commercial designation." *Id.*  The Government has established herein the common and commercial meaning of "grinding" and "crushing."  To the extent plaintiff is seeking to have this Court apply a definition that is different from the common meaning, the burden of establishing a different "commercial designation" belongs to plaintiff.

*       *       *

Because the principal function of the VAZ 1600 and the VAZ 1800 machines is not "grinding," "crushing," "screening," as plaintiff contends, nor is the principal function "mixing, kneading," "sifting, homogenizing, emulsifying or stirring," the merchandise is not properly classified under subheading 8749.82.00.

### C.  Plaintiff's Application Of The Tariff Statute Is Unpersuasive

Plaintiff errs in its application of the terms "grinding" and "crushing" to the function of the imported merchandise.  Although the parties appear to agree generally on the mechanical operation of the machine, *see* Pl. Br. at 14-20, the machines at issue do not "crush" or "grind," as those terms are defined, and the principal function is not "screening," as established above.  Plaintiff's attempts to claim otherwise, or discount the arguments made herein, are unpersuasive.

As a threshold matter, plaintiff asserts that the operation of the machine can be characterized using the statutory terms "grinding," "crushing," *or* "screening," and describes the operation of the machines using a host of other terms. *See* Pl. Br. at 13-23.[7]   Plaintiff further concludes that "the VAZ 1600 and VAZ 1800 are machines that crush, grind, and screen as their primary functions . . . ."  Pl. Br. at 13; *see* Pl. Br. at 23 (noting that "these machines perform crushing, grinding, **and** screening functions . . .").  Plaintiff's conclusion that many of the listed functions are the primary or principal functions of the machines is not a proper application of the statute and is likewise not supported in the record.  Plaintiff has not established – nor can it – that any of the individual terms listed in subheading 8479.82.00 describe the operation of the machine, and further has not established that any of those individual terms describe the machines' principal function. *See* Note 3 to Section XVII; Note 7 to Chapter 84.

Specifically with respect to the term "grind," plaintiff fails to identify any evidence of the use of pressure, force or friction in the operation of the machines.  To the contrary, its own witnesses testified that the only pressure exerted by the ram was to push that material towards the rotor. *See supra* at 8-9.  Moreover, the only action of the machines identified by plaintiff that involves pressure or friction was when, in certain circumstances, the material hits against the screen after passing through the space between the rotor and the counter knife.  Pl. Br. at 20.  This, plaintiff contends, occurs when material that passes through the space between the rotor

---

[7] *See e.g.*, Pl. Br. at 14 (The machines "perform crushing, grinding, and screening functions."); Pl. Br. at 16-17 (citing Mr. Kolbet's testimony, describing the action of the machines as "impacting [the material], breaking it, crushing [and] scooping," but also noting that there is "some shredding" "some cutting" as well as "grinding and crushing"); Pl. Br. at 17 (citing Mr. Sturm's testimony describing cutting or scooping); Pl. Br. at 18 (describing a process of "impacting, breaking, crushing, and scooping" materials); Pl. Br. at 19 (describing the process as "breaking, crushing or scooping," and later citing Mr. Sturm's testimony which described the process as "shredding or cutting or size reduction . . . or grinding" ); Pl. Br. at 20 (stating that the "machines break and demolish input material.")

and counter knife is not small enough to pass through the screen, but cannot make it back to the cutting chamber for further size reduction.  Pl. Br. at 20; Def. Ex. 3 (Kolbet Dep.) at 84:25-87:1. Even assuming, for this argument, that the material that does not make it back to the cutting chamber can hit or grind against the screen in some instances, Mr. Gary Kolbet, Vecoplan's Vice President of Engineering, testified that this is not the ideal functioning of the machine.  Def. Ex. 3 (Kolbet Dep.) at 84:25-87:1.  He characterized it, instead, as a "bi process."  *Id*.  Undoubtedly, this "bi process" does not make "grinding" the principal function of the machines.

Moreover, as set forth above, the material that is the output of the machine cannot be considered "ground" material.  Although plaintiff acknowledges that the output of the "grinding" process should be particle size material, *see e.g.,* Pl. Br. at 7, 8, plaintiff improperly defines the term "particle" to include all "relatively small pieces" or "relatively smaller pieces."  Pl. Br.at 20; 21, 29.  *See* Def. Ex. 4 (Kolbet Dep.) at 187:5-188:2 (defining "particle" to include "any smaller pieces of material," or whatever "comes out of the machines as the product," and "not necessarily" something powder-like);  Def. Ex. 5 (Beusse Dep.) at 113:8-12 (defining "particle" as "whatever the output is of the machine.")  The output material that results from the "grinding" process is a particle – which is defined as extremely small pieces or powder.  *See supra* at 17-18. The imported merchandise is not intended to produce material the size of powder.  Indeed, the openings in the screens fitted on the machine can be as large as 6 inches in diameter, Pl. Ex. 1 (VAZ 1300-1600) at 3; Pl. Ex. 15 (Letter) at 16-20, and the material that is the output of the process can range from 1 to 3 inches or more.  Pl. Ex. 15 (Letter) at 7-14; Def. Ex. 4 (Kolbet Dep.) at 230:9-22

The examples below are vinyl flooring and seatbelts that have been reduced in size by the machines at issue.  Pl. Ex. 15 (Letter) at 11, 13.



*Id.* Although plaintiff considers the above samples crushed or ground, this conclusion is wrong. Pl. Br. at 21. Indeed, the material depicted above cannot be considered powder or particle size; nor can the pieces be described as "very small." As stated above, the machines at issue are meant to reduce the size of various materials, including: "paper, cardboard, plastic film, cloth, webbing, [and] textile fibers of natural and synthetic material." Pl. Ex. 17 (453 Patent) at 5; Pl. Ex. 16 (803 Patent) at 17; Def. Ex. 3 (Sturm Dep.) at 28:17-21; 43:9-18, 135:4-11; Def. Ex. 1 (Rogs) at 3. Most, if not all, of those materials are not reduced to powder or particles by the machines at issue. *See* Pl. Ex. 15 (Letter) at 7-14.

With respect to whether the principal function of the machines is "crushing," plaintiff fails to show how the machines use pressure or force to squeeze the material between hard surfaces such that it is condensed or destroyed. That is not how the machines operate and, therefore, plaintiff has failed to show that the material that is produced by the imported machines is crushed.

Mr. Beusse, a former Managing Director and Chief Operating Officer for Vecoplan, defined "crush," as "impact and shatter." Pl. Br. at 7-8; Def. Ex. 5 (Beusse Dep.) at 129:12-

130:9.  Mr. Kolbet similarly defines the term "crush" with the term "impact," describing the interaction of the material with the cutters.  Def. Ex. 4 (Kolbet Dep.) at 58:15-59:14.  Plaintiff notes, that the "rotating shaft . . . [interacts] harshly with the input material causing it to break into small pieces."  Pl. Br. at 18.  However, neither plaintiff's definition, "impact and shatter," nor the process plaintiff describes, a harsh interaction with the material being reduced, establish that "crushing" is the machine's principal function.  Indeed, plaintiff acknowledges that the description of "impact and shatter" only applies to hard material, Def. Ex. 5 (Beusse Dep.) at 129:12-130:9, but the machines at issue are meant to process a range of materials (many of which are not hard).  *See e.g.* Pl. Br. at 22 (noting that the vinyl flooring, which plaintiff claims should have been "cut or sheared," were "torn."); Pl. Br. at 22 (noting that newspaper was similarly "torn.")  Moreover, as Mr. Sturm testified, the purpose of the low speed, high torque machine is to "use the cutters to cut or scoop out material instead of just shatter something or have the impact . . . ."  Def. Ex. 3 (Sturm Dep.) at 133:5-12.  He specifically agreed that the goal is not to crush material.  *Id*.  This testimony shows that "crushing" is not the principal function of the machines.

Plaintiff further contends that name of the product is irrelevant.  Pl. Br. at 13.  Although we do not rely, as plaintiff asserts, on the naming of the product in support of our argument, Pl. Br. at 23, the description of the merchandise in marketing literature and other commercial documents, while not dispositive, is probative of its function.  Indeed, plaintiff refers to these machines as "shredders" in its brochures, Pl. Ex. 1 (VAZ 1300-1600); Pl. Ex. 2 (VAZ 1800); *see also* Def. Ex. 5 (Beusse Dep.) at 150:4-151:19, calls the machine a "shredder" in the application to the U.S. Patent and trademark office (and resulting patent), and has used that name for the past twenty years.  *see* Pl. Ex. 17 (453 Patent); Pl. Ex. 16 (803 Patent); Def. Ex. 7 (Patent Application

Publication).  Moreover, contrary to plaintiff claims that it is only called a "shredder" when marketed to the plastics industry, Pl. Br. at 25, the imported merchandise is referred to as a "shredder" across industries, as the name "shredder" is used in Vecoplan's general brochure.  Pl. Ex. 1 (VAZ 1300-1600); Def. Ex. 5 (Beusse Dep.) at 150:4-151:19.  Moreover, the name is not only used by Vecoplan, but throughout the industry.  Def. Ex. 5 (Beusse Dep.) at 133:19-23.

That said, as set forth above, when demonstrating the appropriate classification of the merchandise, as is required by the terms of the tariff statute, we focus on the function of the machines, rather than its name.  *See supra* at 15-30.  To be sure, cutting and shredding properly characterize the operation of the merchandise at issue and "grinding" and "crushing" do not.  *See supra* at 21.

### D.  The German Version Of The Harmonized System Should Not Be Considered

Vecoplan references the Harmonized System ("HS") and asks the Court to consider the German language version of the European Union's implementation of the HS when making its decision.  Pl. Br. at 29-30.  The Court should reject this request for a number of reasons.  As a threshold matter, the official languages of the World Customs Organization ("WCO"), which develops the Harmonized Commodity Description and Coding System, known as the HS, are English and French.  Def. Ex. 17 (World Customs Organization) at 1.  Under Article 3 of the International Convention on the Harmonized Commodity Description and Coding System ("HS Convention"), it is the obligation of the Contracting Parties that "its Customs tariff and statistical nomenclatures . . . [are] in conformity with the Harmonized System."  *Id.* at 4.  Here, the HS originated in English and not German.  Therefore, any German translation of the HS was intended to conform with the official HS.  Thus, a German translation of the document should

not be applied to alter the meaning of the terms in English, the official (and original) languages of the WCO and the tariff.

Moreover, plaintiff cites to *Cummins, Inc. v. United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006) in support of its contention that "respectful consideration" should be given to the German version of the HS.  Pl. Br. at 29.  The U.S. Court of Appeals for the Federal Circuit in *Cummins*, however, held that *decisions* of either the WCO or a foreign tribunal may be given respectful consider – it made no reference to foreign translations of the HS.  *Cummins*, 454 F.3d at 1366.  Therefore, the Court should disregard plaintiff's reference to the German translation of the HS.

*     *     *

In short, the merchandise at issue is not properly classified in subheading 8479.82.00, HTSUS, as the terms of that subheading do not describe the principal function of the imported machines.  The machines do not grind or crush material, and although there is a screen installed within the machines, the function of the screen does not reflect the principal function of the merchandise as a whole.

### III.    THE SUBJECT MERCHANDISE IS PROPERLY CLASSIFIED IN SUBHEADING 8479.89.94

Again, the parties agree that the merchandise is properly classified in heading 8479, HTSUS, as "[m]achines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof."

At the 6-digit subheading level, the "[o]ther machines and mechanical appliances" category of heading 8479 is divided according to the function of the machines: subheading 8479.81 covers merchandise "[f]or treating metal, including electric wire coil-winders;" subheading 8479.82 covers machines for "[m]ixing, kneading, crushing, grinding, screening,

36

sifting, homogenizing, emulsifying or stirring machines;" and subheading 8479.89 is the "other" basket provision.  None of the subheadings above the basket provision specifically describe the imported machines.

Where merchandise is properly classified under a specific heading but does not fall within any specific subheading, it is properly classified under the relevant heading's basket or catch-all provision.  *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002); *see also Well Luck Co., Inc. v. United States*, 887 F.3d 1106, 1117 (Fed. Cir. 2018) (holding that, because the subject merchandise did not fall within any of the eight-digit level subheadings preceding the HTSUS subheading with the term "other", it is properly classified under the "other" subheading) (citing to *Rollerblad*e, 282 F.3d at 1354).  Consequently, the merchandise is properly classified as "other" machines in subheading 8479.89.94.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny plaintiff's motion for summary

judgment, enter summary judgment for defendant United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
By:   JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Monica P. Triana
MONICA P. TRIANA
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Room 346
New York, New York 10278
Tel. (212) 264-9240 or 9230
Date:  January 25, 2023    *Attorneys for Defendant*

38

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

|  |  |  |
|---|---|---|
| | : | |
| VECOPLAN, LLC, | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00126 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| Defendant. | : | |
| | : | |

CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT
STANDARD CHAMBER PROCEDURE 2(B)

I, Monica P. Triana, trial counsel in the Office of the Assistant Attorney General, Civil

Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for

the foregoing brief, relying upon the Microsoft Word count feature of the word processing

program used to prepare the brief, certify that this brief complies with the type-volume limitation

under USCIT Standard Chamber Procedure 2(B) and contains 11,810 words.


/s/ Monica P. Triana