UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, SENIOR JUDGE

|  |  |
|---|---|
| VECOPLAN, LLC, | : |
|  | : |
| Plaintiff, | : |
|  | : Court No. 20-00126 |
| v. | : |
|  | : |
| UNITED STATES, | : |
|  | : |
| Defendant. | : |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S RESPONSE TO PLAINITFF'S MOTION FOR SUMMARY JUDGMENT**

On behalf of Vecoplan LLC,

Lawrence M. Friedman
**BARNES, RICHARDSON & COLBURN, LLP**
303 East Wacker Drive
Suite 305
Chicago, IL 60601
O: 312 297-9554
M: 847 331-5797
lfriedman@barnesrichardson.com

**TABLE OF CONTENTS**

**INTRODUCTION**……………………………………………………….……...……………1

**DEFENDANTS DEFINITIONS OF "GRIND" DO NOT EXCLUDE THE SIZE REDUCTION MACHINES**……………………………………………………...….……..3

**THE SIZE REDUCTION MACHINES APPLY PRESSURE, FORCE, AND FRICTION TO BREAKUP WASTE MATERIALS**……………………………………..……………..6

**GOVERNMENT HAS NOT SUFFICIENTLY DISTINGUISHED THE CASELAW**……………………………………………………………………..…………….9

**THE COURT MAY CONSIDER EXAMPLES OF COMMON USAGE**…………………..10

**PLAINTIFF CORRECTLY APPLIES THE HARMONIZED TARIFF SCHEDULE**……………………………………...…………………………………………..12

**CONCLUSION**………………………………………………………………………………12

# **TABLE OF AUTHORITIES**

**Cases**

*Crown Cork & Seal Co., Inc. v. United States*, 65 Cust. Ct. 483 (1970)……………………………...9, 10
*Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228 (Ct. Int'l Trade 2011)………………………...12
*Marbury v. Madison*, 5 U.S. 137, 2 L. Ed. 60 (1803)……………………………………………………11
*Medline Indus. v. United States*, 62 F.3d 1407 (Fed. Cir. 1995)……………………………………..…11
*Samsung Int'l v. United States*, 887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012)…………………………..12
*Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272 (Fed. Cir. 2016)…………………….…11
*United States v. Colonial Commerce,* 44 C.C.P.A. 18 (1956)……………………………………………9, 10
*United States v. May Department Stores Co.*, 16 Ct. Cust. 353, T.D. 43090, Treas. Dec. 43090 (1928)…12
*Universal Elecs. v. United States*, 112 F.3d 488 (Fed. Cir. 1997)……………………………………….11

 **Statutes**

HTSUS Subheading 8479.82.00……………………………………………………………………...13

**Rules**

USCIT Rule 56…………………………………………………………………………………...10, 11

**Other Authorities**

Defendant's Cross-Motion for Summary Judgment………………………………………….*passim*
Defendant's Exhibit 3: Deposition of Thomas Sturm…………………………………………….*passim*
Defendant's Exhibit 4: Deposition of Gary Kolbet……………………………………………4, 5, 6, 8
Defendant's Exhibit 5: Deposition of Len Beusse…………………………………………………..6, 8
Defendant's Exhibit 12: Merriam Webster, (2023)……………………………………………….3, 4
Defendant's Exhibit 15: Macmillan Dictionary (2023)……………………………………….....3, 4
Defendant's Exhibit 16: The RandomHouse College Dictionary (1982)……………………………3
3 <u>Environmental Engineering Handbook</u>, (1974) …..……………………………………………12
Lewis, <u>Hawley's Condensed Chemical Dictionary</u> (5th Ed., John Wiley & Sons, Inc. 2007)……...9, 10
<u>Merriam Webster</u>, "torque" (2023) ……………………………………………..……………..6, 7
5 <u>Organic Gardening And Farming, Issue 5</u> (1958)   …………………………………………12
Plaintiff's Corrected Motion for Summary Judgment…………………………………………...1, 4, 11
Plaintiff's Exhibit 1: Vecoplan, VAZ 1300-1600 New Generation Shredders……………………2, 4
Plaintiff's Exhibit 2: Vecoplan, VAZ 1800 Rotary Shredder……………………………………...2
Plaintiff's Exhibit 15: Vecoplan's Response to Customs Proposed Notice of Action…………….4, 5
Plaintiff's Exhibit 17: U.S. Patent No. 6,837,453 B2…………………………………………...2
<u>The American Heritage Dictionary of the English Language,</u> (1975)…………………………..7, 8, 9
1 <u>Van Nostrand's Scientific Encyclopedia</u> (10th Ed. John Wiley & Sons, 2008)…………………7
1975 <u>World Book Encyclopedia</u> ………………………………..………………………………...12

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, SENIOR JUDGE

|  |  |
|---|---|
| VECOPLAN, LLC, | : |
| Plaintiff, | : |
| v. | : Court No. 20-00126 |
| UNITED STATES, | : |
| Defendant. | : |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S RESPONSE TO PLAINITFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Vecoplan, LLC, respectfully submits this memorandum in response to defendant's cross-motion for summary judgment and in reply to defendant's response to plaintiff's motion for summary judgement. For the further reasons stated herein, plaintiff requests that this Court grant plaintiff's motion for summary judgment and deny defendant's cross-motion for summary judgment.

I. INTRODUCTION

Plaintiff and defendant agree on the significant facts of this case and in particular the mechanical operation of the size-reduction machinery. In addition to the description of the merchandise contained in Plaintiff's Corrected Motion for Summary Judgment, Pl. Br. 14-20. plaintiff notes the following areas of agreement between plaintiff and defendant.

Defendant states, and plaintiff agrees, that most of the size reduction occurs in the VAZ 1600 and VAZ 1800 machines when the material interacts with the rotor. Def. Br. at 7 ("The cutters, which are mounted on the spinning rotor, are responsible for the size reduction of the material being processed . . . . [M]ost of the size reduction occurs when the material being reduced interacts

with the rotor."). Later, defendant states that the "purpose of the ram is to get the material close enough to the rotor . . . to allow the spinning rotor to do the work of cutting or shredding the material." Def. Br. at 8. Citing the deposition testimony of Mr. Sturm, Vecoplan AG's Head of the Department of Quality Environmental Safety and Health, defendant acknowledges that the interaction between the cutters on the rotor and the material is what "shreds or takes scoops out of the materials that is being reduced in size." Defendant also agrees that only after being reduced in size by the cutting inserts on the rotor, when the material is small enough, it passes through the space between the rotor and counter knife. Def. Br. at 9 (citing Pl. Ex. 17, the '453 Patent at 5, 6; Def. Ex. 3 (Sturm Dep.) at 52:25-53:12). At that point, the counter knife may mesh with the cutters to cut the material further reducing it in size.  Def. Ex. 3 (Sturm Dep.) at 69:3-9.

Plaintiff and defendant also agree that these machines operate at low speed with high torque. Def. Br. 11-12; See also, Pl. Ex. 1 at 001 (VAZ 1300-1600) and Pl. Ex. 2 at 002 (VAZ 1800). The purpose of the low speed, high torque rotor is to allow for efficient size reduction while avoiding friction that can be generated at higher speeds. Def. Br. 11-2 (citing Def. Ex. 3 (Sturm Dep.) at 131:18-25). In this context, the "friction" is drag on the rotor. For example, Mr. Sturm testified it is not efficient for the ram to create excess pressure against the rotor. Def. Ex. 3 (Sturm Dep.) at 65:14-66:7. Later, Mr. Sturm reiterated that high-speed machines create a lot of friction that is not used to disintegrate the product. *Id.* 131:20-132:4. Mr. Sturm did not testify that the process of size reduction that occurs when the cutting inserts engage the material in the hopper happens without friction. As is discussed below, destroying the waste material with rotating cutters necessarily requires the application of pressure, force, and friction.

Regarding the screen, defendant agrees that the screen forces material that has not been sufficiently reduced in size to be reprocessed "by the rotor." Def. Br. at 11 (citing Def. Ex. 3 (Sturm Dep.) at 51:21-52:15; Pl. Ex. 17, the '453 Patent at 5). Importantly, defendant downplays the role of the screen saying that "there is often a screen surrounding the rotor . . . ." Def. Br. at 11. In fact, Mr.

2

Sturm testified that "Ninety-nine percent of the applications require a screen." He went on to say that "There's very, very little occasions where you would say a screen is not necessary, but the utmost number of applications that I know would definitely require a screen." Def. Ex. 3 (Sturm Dep.) at 60:2-12.

II.     DEFENDANT'S DEFINITIONS OF "GRIND" DO NOT EXCLUDE THE SIZE REDUCTION MACHINES

The definitions of "grind" advanced by defendant are largely consistent with plaintiff's definitions. The variety of meanings of "grind" show the importance of taking into consideration the full context of this machine including its size and the variable nature of the materials it is designed to process. For example, some definitions of "grind" clearly address the unrelated concept of honing, polishing, or sharpening a surface. This is true of the second meaning in Def. Ex. 12 ("wear down, polish, or sharpen by friction") and the first meaning is Def. Ex. 16 ("to wear, smooth, or sharpen by abrasion or friction").

The relevant definitions are broad enough to encompass the Vecoplan machines. For example, defendant's first citation is to The Merriam-Webster Dictionary of grind as "1: to reduce to powder or small fragments by friction . . . ." Def. Br. at 17, Def. Ex. 12. Leaving for the moment the question of "friction," this definition makes it clear that grinding need not reduce material to powder; it is sufficient that the material be reduced to small fragments. Similarly, the Macmillan Dictionary, *Id.*, Def. Ex. 15, defines "grind" as "to break something into very small pieces or powder, by using a machine or by crushing it between two hard surfaces." This definition is particularly enlightening in that it encompasses grinding machines that do not produce powder. The second meaning from the RandomHouse Dictionary on which defendant relies, *Id.*, Def. Ex. 16, is similarly broad in its definition of grind as "to reduce to fine particles, as by pounding or crushing, to pulverize." Defendant has provided a definition of "particle" that includes "a relatively small or the smallest discrete portion or amount of something." Def. Ex. 12 at 355.

3

While some of the cited definitions refer to "powder," the output of a grinder need not be powder. Instead, it may be "very small pieces," Def. Ex. 15 at 486, "small fragments," Def. Ex. 15 at 345, or just "relatively small," Def. Ex. 12 at 355 (defining "particle"). Also, the definitions allow for multiple avenues to reach this result, including pressing between hard surfaces but also breaking, pounding, and crushing. The Macmillan Dictionary, Def. Ex. 15 at 487, includes a telling definition of "grind" as "to cut food, especially raw meat, into very small pieces using a machine." This definition highlights that grinding includes cutting into very small pieces.

Regarding the size of the particles the Vecoplan machines produce, the diameter of the holes in the screens range from 3/8" to 6." Plaintiff's Exhibit 1 at 3. Mr. Sturm testified that the "typical screen for many applications" is 3/4". Def. Ex. 3 (Sturm Dep.) at 87:4-6. The waste materials these machines process are significantly larger than the holes in the screens. Mr. Kolbet stated that the machines at issue can process logs if they fit in the hopper. Def. Ex. 4 (Kolbet Dep.) at 248:16-24. He later stated that the machines can process a "large plastic purging," describing a purging as "a very rigid . . . pretty big piece." *Id.*, 262:10-14. Because the output must be size reduced to fit through the screen, the machines are designed to grind large items into relatively small pieces.

The fact that the pieces are relatively small is evident from the full Plaintiff's Exhibit 15, which was attached to its Motion for Summary Judgment. That document includes larger and clearer pictures of a variety of materials that have been processed in Vecoplan single-shaft rotary size reduction machines. That the output of the VAZ machines is small or relatively small particles is evident from the sample of material that was formerly Kevlar helmets (page numbered GOV181), which has been ground down to a relatively fine, fibrous mass. Similar results are seen for the ground Teflon purge (GOV000186) and the newspaper (GOV000188).

Other examples of post-processing material have larger and irregular particles. The pieces of ground up bowling ball (GOV000182), for example, are comparatively large. This, however, is a function of the two-inch screen size selected for the sample. A smaller screen would have resulted in

4

the pieces of the bowling balls being in contact with the spinning rotor longer, producing a finer grind. Even with the two-inch screen, the bowling balls have been broken, demolished, and divided into relatively small particles. This is also true of the woven seatbelts (GOV000187), which were processed using a two-inch screen and are, nevertheless, reduced to a fibrous mass of relatively small pieces that bears little resemblance to the original material. The vinyl flooring (GOV000185) appears to retain the largest particle size and most intact appearance of the examples in Pl. Ex. 15. However, it is important to note that material was processed without a screen, which is an exceedingly rare circumstance. Def. Ex. 3 (Sturm Dep.) at 60:2-12. Any size screen would have forced the vinyl flooring material back into the hopper to be further processed into smaller particles.

The government's remaining efforts to narrow the scope of "grinding" machines also fail. First, the meaning of the term "shredder" is irrelevant in that the question before the Court is whether the subject merchandise crushes, grinds, or screens as its primary or principal function. Second, the defendant's definitions of "shred" include that the output will be "long narrow strip[s]" or "long and narrow fragments." Def. Br. at 21. As the Court can see from the photographs in Plaintiff's Ex. 15 to its Motion for Summary Judgment and as discussed above, long strips and long fragments are not the output from these machines.

Defendant's effort to limit the meaning of "crush" also fails. The definition it provides includes "to reduce to particles by pounding or grinding." Def. Br. at 27. Thus, crushing need not involve static squeezing until the item is compressed or breaks. Based on this definition, crushing is a means of size reduction by grinding. In the Vecoplan machines, size reduction occurs where the cutters "hit" and "impact" the waste material. That pounding is, by the defendant's proffered definition, "crushing." See Def. Ex. 4 (Kolbet Dep.) at 265:6-13 (describing how the cutters "hit" and "impact" the material being processed).

Vecoplan's machines use a rotating shaft with cutting inserts to break or scoop material out of a larger mass of waste product until the waste is reduced to an output that fits the selected screen

size. This is a machine that breaks, crushes, pounds, pulverizes, cuts, or otherwise grinds material. The defendant's definitions are not sufficiently and consistently contrary to this understanding of the term "grind" to exclude the VAZ1600 and VAZ 1800 from classification as grinding machines.

### III. THE SIZE REDUCTION MACHINES APPLY PRESSURE, FORCE, AND FRICTION TO BREAKUP WASTE MATERIALS

Defendant contends that the machines do not grind because "the processing of material through the imported shredders does not use pressure, force, or friction to cut the material." Def. Br. at 18.[1] Defendant also states that "the only pressure exerted within the machine is when the ram moves material toward the rotor." *Id.* at 19. Defendant concludes that "the machines specifically do not operate by using friction; instead, the low speed, high toque machines operate by allowing the cutters to reduce the material." *Id.*

The subject machines, it is agreed, operate at low speed and high torque. In his deposition, Mr. Sturm explained that "torque" is the force with which the rotor turns. Def. Ex. 3 (Sturm Dep.) at 131:9-10. He also explained that the mechanical power applied to the rotor is the speed of the rotor times torque. *Id.*, 131:6-7. Mr. Beusse, Vecoplan's former Chief Operating Officer, Def. Ex. 5 (Beusse Dep.) at 12:3, testified that lower speeds produce higher torque and more power applied to the rotor. *Id.* 96:3-14; 103:13-14. During a series of questions on torque, counsel for the United States asked Mr. Kolbet, "So it goes slow, but it's very strong?" Mr. Kolbet answered, "Yes." Def. Ex. 4 (Kolbet Dep.) at 103:16-104:3. Later, Mr. Kolbet explained the relationship between the horsepower of the motor and torque, noting that changes in horsepower affect "the torque and the force **supplied to the cutters**." *Id.* 116:21-117:5 (emphasis added).

This is consistent with the definition from Merriam-Webster Online of "torque" as "a force that produces or tends to produce rotation or torsion." Merriam Webster, "torque" (2023), available

---

[1] Here, the Government appears to concede that griding machines "cut" material.

at https://www.merriam-webster.com/dictionary/torque, (Last visited Feb. 20, 2023)(Attached as Pl. Ex. 25).

There is no basis on which this Court could find that the Vecoplan low speed, high torque size reduction machines apply no force to the waste material that is being processed. The purpose of engineering these machines with high torque is to supply force to the cutters to efficiently process waste materials. While it is true that the force applied by the ram pushes the waste material in the hopper into contact with the rotor, that in no way diminishes the pounding, shattering, crushing, and scooping action of the cutting inserts affixed to the rotor. The Court should see it as self-evident that if the machines somehow did not apply force to the waste material, the material would be unchanged, defeating the purpose of the machines. This is rudimentary physics.

If more is needed on this point, a technical reference defines "force" as, in part, "the physical agent that produces an elastic strain in a body." 1 Van Nostrand's Scientific Encyclopedia, 2060 (10th Ed. John Wiley & Sons, 2008)(Pl. Ex. 26). A more general definition is "Power made operative against resistance; exertion: *use of force in driving a nail*." The American Heritage Dictionary of the English Language, 513 (1975)(Pl. Ex. 27). In this context, the impact of the cutters, which are akin to a hammer striking the waste material, transmits force to the waste material, producing elastic strain to break, tear, scoop or cut it into smaller pieces. That action is consistent with the common and commercial meaning of "grinding."

The same is true of pressure. The American Heritage Dictionary of the English Language defines "pressure" as, among other things, "The application of continuous force by one body upon another that it is touching . . . ." In the realm of physics, the same dictionary defines "pressure" as "Force applied over a surface, measured as force per unit of area." The American Heritage Dictionary of the English Language, 1037 (1975)(Pl. Ex. 28).

Defendant's assertion that "the only pressure exerted within the machine is when the ram moves material towards the rotor," Def. Br. at 19, is derived from testimony about the action of the

7

ram on the waste material and the resulting pressure applied to the rotor. Mr. Kolbet testified that that the ram applies pressure to the material in the chamber to move the material into contact with the rotor, which allows the cutters to do the size reduction. Def. Ex. 4 (Kolbet) at 63:2-16. Mr. Sturm provided similar testimony about the function of the ram and the pressure it generates. He stated that "Some material is just brought near to the rotor [by the ram], more or less pressure less. Other material sometimes requires a little pressure against the spinning rotor so that it is grabbed . . . ." Def. Ex. 3 (Sturm Dep.) at 65:18-21. Again, the fact that the ram exerts little pressure on the waste material does not mean that the action of the cutting inserts on the waste material occurs without pressure. Mr. Sturm confirmed this when he agreed that he was referring to the "pressure from the ram . . . ." Def. Ex. 3 (Sturm Dep.) at 83:2-6. This explains why Mr. Beusse testified that the ram does not process the material; it edges the material to the rotor where it is processed. Def. Ex. 5 (Beusse Dep.) at 115:8-16.

Every strike of the cutting inserts on the waste material in the hopper creates pressure in the material. If no pressure were applied to the waste material, the machine would fail in its intended purpose. In other words, the limited lateral pressure needed to push the input material toward the rotor and cutting inserts does not mean that the high torque, spinning rotor with cutting inserts is not applying pressure to the input material. It must do so to function; which is also rudimentary physics.

The remaining part of the government's trinity of grinding is friction. First, plaintiff notes that the criteria put forward by the defendant is disjunctive, requiring that grinding occur as a result of "pressure, force, or friction." Def. Br. at 18. Thus, the alleged lack of friction, in light of the presence of either pressure or force does not exclude the Vecoplan machines from the category of grinders. There is, however, ample friction at work in the size-reduction process.

"Friction" is "A force tangential to the common boundary of two bodies in contact that resists the motion or tendency to motion of one relative to the other." The American Heritage

8

Dictionary of the English Language, 527 (1975)(Pl. Ex. 29). This is the force that allows the cutters to bite into and scoop out material rather than simply slide off the waste material. As was true with pressure and force, in the absence of friction, the machines could not operate.

Another definition of friction is "The rubbing of one object or surface against another." *Id.* As discussed below in reference to the prior case law, grinders need not operate on any one methodology. Moreover, as the Court can see in the video of a Vecoplan machine grinding a bowling ball, https://youtu.be/JBxWcjMxhkg (last visited Feb. 22, 2023), the ram pushes the bowling ball against the spinning rotor, at which point the cutting inserts engage with the bowling balls. As the ball contacts the spinning rotor, the moving cutters are making rapidly repeating contact, literally rubbing away the material.

The evidence clearly establishes that Vecoplan's size reduction machines operate by applying strong force to the waste material that creates pressure and friction. Together, these forces scoop, break, cut, and generally divide the waste material into smaller pieces. That action is grinding.

IV. GOVERNMENT HAS NOT SUFFICIENTLY DISTINGUISHED THE CASELAW

The parties agree that *United States v. Colonial Commerce,* 44 C.C.P.A. 18 (1956) and *Crown Cork & Seal Co., Inc. v. United States*, 65 Cust. Ct. 483 (1970) are not binding on this Court. Def. Br. 23. They are, however, informed interpretations of the meaning of "grinding" and are, therefore, worthy of consideration to whatever degree the Court finds them persuasive. Also, Defendant agrees with *Colonial Commerce* that "grinding" covers a "variety of processes by which materials are divided up into relatively small particles." *Id.,* citing *Colonial Commerce*, 44 C.C.P.A. at 20.

While the Court in *Colonial Commerce* did not extend the meaning of "ground" to describe every divided powder, the only counter example the Court provided was powder precipitation, which is a chemical reaction in which insoluble particles are generated from two materials in solution or gas.  See Lewis, Hawley's Condensed Chemical Dictionary, 1039 (5th Ed., John Wiley & Sons, Inc.

9

2007)(Pl. Ex. 30). Precipitation does not begin with relatively larger materials that are reduced in size by mechanical means. Thus, it is clearly not a grinding process. Except for precipitation, the Court concluded that "grinding" is a physical process involving friction or crushing and is broad enough "to cover a variety of processes by which materials are divided into relatively small particles." *Colonial Commerce*, 44 C.C.P.A at 20.

*Crown Cork & Seal* is similarly instructive despite the defendant's insistence to the contrary. Defendant provides a thorough explanation of the production process at issue in that case. Def. Br. at 25. Defendant concedes that the process at issue there, which produced particles of up to ½" in the longest linear dimension, was grinding, Def. Br. at 25 ("Our interpretation of the term 'grind' is consistent with the Court's interpretation of the term 'ground' . . .."), thereby eliminating the notion that the output of a grinder must be powder or similarly sized particles. Defendant attempts to distinguish this process on the basis that it involves the application of friction or crushing. Def. Br. 25. That distinction is not tenable. Vecoplan's cutting inserts rotate and impact the waste material, resulting in crushing at the impact site. Also, there is friction between the cutting inserts and the waste material because of the contact between the material and the moving cutters and rotor. Both *Colonial Commerce* and *Crown Cork & Seal* reached conclusions that the meaning of "grinding" is a broad term that emphasizes a variety of means of reducing material to small pieces. These cases, therefore, support finding that the common and commercial meaning of "grinding machine" is broad enough to encompass the Vecoplan VAZ 1600 and VAZ 1800 machines, which employ pressure, friction, and force to grind waste material into relatively small particles through scooping, breaking, and cutting.

V. <u>THE COURT MAY CONSIDER EXAMPLES OF COMMON USAGE</u>

Citing Rule 56(c)(2) of the rules of this Court, defendant asks the Court to disregard examples of common and commercial usage plaintiff included in its brief. Def. Br. 26. That rule

provides that "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence." The defendant is misapplying the rule. The cited materials are not submitted to the Court in support of or to dispute a fact.

The potentially dispositive question before the Court is the meaning of "grinding machine." The law is clear that the meaning of a tariff term is a question of law, not fact. *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016). The legal argument relating to the meaning of the tariff term, therefore, does not involve the production of evidence. As plaintiff already noted in its initial brief, Pl. Br. at 4, and according to the Federal Circuit:

> Questions of law such as these lie within the domain of the courts, for 'it is emphatically the province and duty of the judicial department to say what the law is.' *Marbury v. Madison*, 5 U.S. 137, 177, 2 L. Ed. 60 (1803). In such a context, the importer has no duty to produce *evidence* as to what the law means because evidence is irrelevant to that legal inquiry.

*Universal Elecs. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997).

The Court has a range of material that it can consider when construing tariff terms. According to *Medline Indus. v. United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995), "in construing such terms the court may rely upon its own understanding, dictionaries and other reliable sources." Dictionaries provide examples of usage to illustrate the meaning of words. The various examples plaintiff has provided perform the same function. Rather than offered as proof of a fact, they illustrate the usage of relevant terms.

Usage examples can inform the Court's own understanding of the meaning of the tariff terms, "crush" and "grind." The cited examples illustrate those meanings and confirm that the common and commercial usage is consistent with the cited definitions and may also be consistent with the Court's own understanding of the words in the statute. They are, therefore, not subject to the requirements of Rule 56(c)(2).

Furthermore, the examples could be presented in admissible form; plaintiff could have an expert testify as to the meaning of the words relying on these same examples. However, that is not

necessary. In *Samsung Int'l v. United States*, 887 F. Supp. 2d 1330, 1338 n.18 (Ct. Int'l Trade 2012), the Court stated that:

> In determining the proper meaning of a tariff heading, the court considers expert opinions, not as fact witnesses, but as experts on the common meaning or understanding of a term in a particular industry. See *Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228, 1240-41 (CIT 2011). Expert opinions are merely advisory, however, and are given weight only to the extent they are consistent with lexigraphic and other reliable sources. Id.

See also, *Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228, 1240-41 (Ct. Int'l Trade 2011); *United States v. May Department Stores Co.*, 16 Ct. Cust. 353, 355-56, T.D. 43090, Treas. Dec. 43090 (1928) ("[I]n determining the common meaning of a term, testimony is only advisory and has no binding effect upon the court, since the common meaning of a term is ordinarily within the cognizance of the court . . . ."). Accordingly, the Court may consider the various examples of usage illustrating the meaning of the tariff terms to whatever extent the Court deems those examples helpful.

There are more such examples of common usage the Court may consider. For example, the 1975 World Book Encyclopedia, 514, states that an under-sink "[g]arbage grinder shreds waste food." Pl. Ex. 31, Available at https://archive.org/details/worldbookencyclo00fiel/page/514/mode/1up?q=%22grinder+shreds%22&view=theater <Last visited Feb. 22, 2023>. A similar reference is made in 3 Environmental Engineering Handbook, 126 (1974), Pl. Ex. 32, Available at https://archive.org/details/environmentaleng0003unse/page/126/mode/1up?q=%22grinder+shreds%22&view=theater <Last visited Feb. 22, 2023>, which states "The home garbage grinder shreds and places into the sewer only the soft food wastes which constitute about 5% to 10% of the household refuse." Going back further, a 1958 article about compost shredders includes a photograph showing hands holding ground up material with the caption, "This is hay and corncobs ground in the shredder and mixed to allow immediate use on the plants." 5 Organic Gardening and Farming, Issue 5, 45 (1958), Pl. Ex. 33, Available at https://archive.org/details/sim_organic-gardening_1958-05_5_5/page/45/mode/1up?q=%22ground+in+the+shredder%22&view=theater

12

<Last visited Feb. 22, 2023>. These examples illustrate the common understanding that grinders shred and shredders, therefore, grind.

IV. PLAINTIFF CORRECTLY APPLIES THE HARMONIZED TARIFF SCHEDULE

Defendant next argues that plaintiff has misapplied the tariff by asserting that more than one function listed in tariff item 8479.82.00 are the primary or principal functions of the machines. Def. Br. at 31. This misunderstands plaintiff's position, which is that the machines are for grinding, which is accomplished, in part, by crushing and screening. Those three functions fully describe the machines, although the result is that they are grinding machines. There is no evidence that these machines have a primary or principal function other than grinding, even if the machines operate through a combination of cutting and crushing, which is facilitated by the screen.

V. CONCLUSION

The government has struggled to differentiate these machines from grinding or crushing machines on the alleged lack of physical force, pressure, or friction applied to accomplish the grinding operation. Def. Br. 18 ("the imported shredders do not use pressure, force, or friction to cut the material.") As discussed above, *supra* 5-9, pressure, force, and friction are all applied or generated by the interaction of the cutting inserts and the waste material.

The government also contends that because they employ cutting inserts and a counter knife to "divide the material into course pieces," Def. Br. 21, the machines cannot be classified as grinding machines. When, as here, the output material is relatively small pieces, nothing about using sharpened surfaces to accomplish that is inconsistent with the common understanding of the term "grinding." The Government's focus on the detail of the operation of the machine rather than the condition of the material after processing is not required for a correct classification and obscures the question before the court.

13

Based on the totality of the agreed facts and the well-established common understanding of grinding as a diverse category of operations, Vecoplan respectfully requests that this Court grant its motion for summary judgment, deny defendant's cross motion, and order Customs and Border Protection to refund the excess duties paid with interest as allowed by law.

Respectfully submitted,

/S/Lawrence M. Friedman

Lawrence M. Friedman
**BARNES, RICHARDSON & COLBURN, LLP**
303 East Wacker Drive
Suite 305
Chicago, IL 60601
O: 312 297-9554
M: 847 331-5797
lfriedman@barnesrichardson.com