## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| VECOPLAN, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Before: Richard K. Eaton, Judge |
| v. | : | |
| | : | Court No. 20-00126 |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## <u>OPINION</u>

[On classification of size-reduction machinery, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied.]

Dated: December 11, 2023

*Lawrence M. Friedman*, Barnes, Richardson & Colburn, LLP, of Chicago, IL, argued for Plaintiff Vecoplan, LLC. With him on the brief was *Pietro N. Bianchi*.

*Monica P. Triana*, Trial Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant the United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Justin R. Miller*, Attorney-In-Charge.

Eaton, Judge: Before the court are the cross-motions for summary judgment of plaintiff Vecoplan, LLC ("Plaintiff") and defendant the United States, on behalf of U.S. Customs and Border Protection ("Customs"). *See* Pl.'s Corrected Mot. Summ. J. ("Pl.'s Br."), ECF No. 55; Pl.'s Resp. Def.'s Cross-Mot. Summ. J. and Reply Def.'s Resp. Pl.'s Mot. Summ. J. ("Pl.'s Reply"), ECF No. 58; Def.'s Cross-Mot. Summ. J. ("Def.'s Br."), ECF No. 51; Def.'s Reply Supp. Cross-Mot. Summ. J. and Opp'n Pl.'s Resp. ("Def.'s Reply"), ECF No. 61. At issue is the proper classification of Plaintiff's recycling machines, which reduce the size of waste material. *See*

Compl. ¶ 9, ECF No. 12. The machines were imported from Germany by Plaintiff in 2018 and 2019. *See id.* ¶ 10; Am. Summons, ECF No. 21.

For the reasons set forth below, Plaintiff's motion is granted, Customs' cross-motion is denied, and the court concludes that Plaintiff's size-reduction machinery is properly classified under the Harmonized Tariff Schedule of the United States ("HTSUS") (2019)[1] subheading 8479.82.00 as "[m]ixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines."

## BACKGROUND

The facts described below have been taken from the admitted portions of the parties' USCIT Rule 56.3 statements and supporting exhibits, as well as from the summons and complaint. The parties agree on the facts not in dispute, except in a few limited instances that are not material to the court's analysis of the issues. *See* Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SOF"), ECF No. 55-4; Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute ("Pl.'s Resp. SOF"), ECF No. 58-3; Def.'s Statement of Material Facts Not in Dispute ("Def.'s SOF"), ECF No. 51-1; Def.'s Resp. to Pl.'s Statement of Material Facts Not in Dispute ("Def.'s Resp. SOF"), ECF No. 51-2. The facts below also consist of findings based on record evidence on which no reasonable fact-finder could come to an opposite conclusion.

The subject merchandise is size-reduction machinery manufactured by Plaintiff's German parent company, Vecoplan Maschinenfabrik GmbH & Co. KG, specifically the VAZ 1600 and

---

[1] All citations to the HTSUS refer to the 2019 edition. *See* Am. Summons (indicating that Plaintiff's subject merchandise was entered in 2018 and 2019). The pertinent tariff provisions in the 2018 edition were unchanged in the 2019 edition.

VAZ 1800 models.[2] Pl.'s SOF ¶ 6; Compl. ¶ 9. The machines reduce solid waste material of

various kinds, including plastic, paper, wood, and solid waste.[3] Def.'s SOF ¶¶ 6, 14. These models

are "large industrial machines, measuring approximately 10 to 14 feet long, 9 to 10 feet wide, and

weighing up to 24,000 pounds." *Id.* ¶ 4.

The size-reduction process varies slightly depending on the type of material that is being

reduced. *Id.* ¶ 56. For each process, however, material is first loaded into an infeed hopper by a

forklift or similar device. *See* Pl.'s SOF ¶¶ 10-11; Def.'s SOF ¶ 28. The material then falls to a

horizontal plate at the bottom of the inside of the machine. Def.'s SOF ¶ 28. The horizontal plate

is at the bottom of an interior space called the cutting chamber. *Id.* A hydraulic ram then pushes,

or applies pressure to, the waste material to move it toward the cutting rotor. *See* Pl.'s SOF ¶ 11;

Def.'s SOF ¶ 37.

The rotor is a single-shaft rotating cylinder that is at the core of Plaintiff's machines. *See*

Pl.'s SOF ¶ 9; Def.'s SOF ¶¶ 1, 16. This rotor is a "high torque" rotor, with "torque" being the

force with which the rotor spins. *See* Def.'s Br. Ex. 4, Kolbet Dep. 103:16-25, ECF No. 51-3

("Kolbet Dep."); *see also id.* Ex. 3, Sturm Dep. 131:8-10, ECF No. 51-3 ("Sturm Dep."). In other

words, the rotor exerts significant force as it spins—it is "very strong." *See* Kolbet Dep. 104:1-3.

The rotor's horsepower, or "power," is also significant, ranging from 75-150 horsepower in the

VAZ 1600 models and up to 200 horsepower in the VAZ 1800 models. Def.'s SOF ¶ 69. A greater

---

[2]     Each model has several variations. The relevant models here are the VAZ 1600 S, VAZ 1600 SXL, VAZ 1600 SXLT, VAZ 1600 M, VAZ 1600 MXL, VAZ 1800 T, and VAZ 1800 NT. Def.'s SOF ¶ 3. The different letters represent variations for the size of the machine, diameter of the rotor, length of the rotor and ram stroke, and function of the machine's drive. *See id.* ¶ 5.

[3]     For instance, the machines reduce materials such as Kevlar helmets, bowling balls, aluminum and copper radiators, shoes, woven seatbelts, newspapers, and vinyl flooring. *See* Pl.'s Br. Ex. 15, ECF No. 55-2.

horsepower means that the rotor is spinning with greater force, and thus, more force is supplied to the cutting inserts.[4] *See* Kolbet Dep. 116:21-117:9.

The cutting inserts[5] are mounted on, and protrude from, ribs of the rotor. Pl.'s SOF ¶ 12; Def.'s SOF ¶ 19. The VAZ 1600 machines have between 42 and 74 cutting inserts, and the VAZ 1800 machines can have 84 or more cutting inserts. Def.'s SOF ¶ 23. Initially, the cutting inserts take scoops out of the material, and thus reduce its size by the force of their action. *See* Pl.'s SOF ¶ 18; Def.'s SOF ¶ 38. The cutting inserts are sharp and have four points. Def.'s SOF ¶¶ 24-25. When the points become dull, the cutting inserts can be rotated so that a sharper edge interacts with the waste material. *Id.* ¶ 24.

After the rotor's cutting inserts initially reduce the size of the material, it falls to the horizontal plate to which the stationary counter knife is fixed. Pl.'s SOF ¶ 19; Def.'s SOF ¶¶ 18, 38-41; Def.'s Resp. SOF ¶ 13. The counter knife is below the rotor. *See* Pl.'s Br. Ex. 1 at 003, ECF No. 55-1 ("Pl.'s Ex. 1"). Here, when the rotor spins, the cutting inserts mesh with v-shaped recesses of the counter knife to further cut the material, reducing it in size even more. Def.'s SOF ¶¶ 19, 42. Once the material is small enough, it passes through the gap between the cutting inserts and the counter knife. Pl.'s SOF ¶¶ 15-16; Def.'s SOF ¶ 58.

Both the VAZ 1600 and VAZ 1800 machines feature a screen, which is almost always used, and has openings ranging from 3/8 inch in diameter to six inches in diameter. *See* Def.'s SOF ¶ 57; Pl.'s Resp. SOF ¶ 57. Material that passes through the space between the rotor and the counter knife must be small enough to fit through the screen's opening. Def.'s SOF ¶ 58.

---

[4]        The horsepower of the rotor equals speed (in rotations per minute) multiplied by force. *See* Def.'s SOF ¶ 68; Sturm Dep. 130:21-131:14.

[5]        The cutting inserts are also called cutters, cutter inserts, and v-cutters. *See* Pl.'s Resp. SOF ¶ 16; *see also* Pl.'s Br. Ex. 1 at 003, ECF No. 55-1; *id.* Ex. 17 at 001, ECF No. 55-2.

The size of the output material varies, depending on (1) the size of the cutting inserts, (2) the size of the screens, and (3) the type of the material being reduced. Def.'s SOF ¶ 60. Sometimes, the output material can be larger than the size of the screen's opening owing to the material's shape. *See id.* ¶ 63. In this case, material moves back to the cutting chamber for further size reduction. *Id.* ¶ 59; *see also* Pl.'s SOF ¶ 16.

In 2018 and 2019, Plaintiff imported the subject machines as separate entries through four ports in the United States. *See* Summons, ECF No. 1; *see also* Am. Summons. At entry, Customs classified the machines under HTSUS 8479.89.94 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other machines and mechanical appliances . . . Other . . . Other"), dutiable at 2.5%. *See* Am. Summons. This subheading is a basket provision.

Plaintiff timely protested Customs' liquidation of entries under HTSUS 8479.89.94 and asserted that the correct classification is HTSUS 8479.82.00 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other machines and mechanical appliances . . . Mixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines"), a duty-free provision. Pl.'s SOF ¶¶ 2-3. Customs denied the protests, and Plaintiff timely filed a complaint with the court. *Id.* ¶ 4; Compl.

## JURISDICTION AND STANDARD OF REVIEW

The court has subject matter jurisdiction under 28 U.S.C. § 1581(a) and reviews Customs' classification determination *de novo. See* 28 U.S.C. § 1581(a) (2018); *see also id.* § 2640(a)(1); *Telebrands Corp. v. United States*, 36 CIT 1231, 1234, 865 F. Supp. 2d 1277, 1279-80 (2012),

*aff'd*, 522 F. App'x 915 (Fed. Cir. 2013). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000) (citing *McKay v. United States*, 199 F.3d 1376, 1380 (Fed. Cir. 1999)). In the context of a customs classification case, summary judgment is appropriate when there is no factual dispute as to the nature of the merchandise in question. *See Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006).

## LEGAL FRAMEWORK

The objective in a classification case is to determine the correct tariff provision for the subject merchandise. *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984). While the court affords deference to Customs' classification rulings relative to their "power to persuade," it has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citation omitted). As such, "the court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand." *Jarvis Clark*, 733 F.2d at 878 (emphasis in original).

The court follows a two-step process when determining the classification of merchandise under the HTSUS. *See Rubies Costume Co. v. United States*, 922 F.3d 1337, 1342 (Fed. Cir. 2019). First, the court "determines the proper meaning of specific terms in the tariff provisions"—a

question of law. *Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed. Cir. 2018). Second, "the court determines under which subheading the subject merchandise is most appropriately classified"—a question of fact. *Id.* "When there is no dispute as to the nature of the merchandise, the two-step classification analysis 'collapses entirely into a question of law.'" *Otter Prods., LLC v. United States*, 834 F.3d 1369, 1375 (Fed. Cir. 2016) (quoting *Cummins Inc.*, 454 F.3d at 1363); *see also Rollerblade, Inc. v. United States*, 24 CIT 812, 813, 116 F. Supp. 2d 1247, 1250 (2000) ("Summary judgment of a classification issue is . . . appropriate 'when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is.'" (quoting *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998))).

The General Rules of Interpretation ("GRI") "govern classifications of imported goods under [the] HTSUS and [are] appl[ied] . . . in numerical order." *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011) (citing *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26) (Fed. Cir. 2007)). GRI 1 directs the inquiry to the proper heading.[6] *See Telebrands Corp.*, 36 CIT at 1235, 865 F. Supp. 2d at 1280. If a good is not classifiable under GRI 1, and if the headings and notes do not require otherwise, then the other GRIs will be considered in numerical order. *See Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163 (Fed. Cir. 2017) ("The GRI apply in numerical order, meaning that subsequent rules are inapplicable if a preceding rule provides proper classification." (citation omitted)). Under GRI 1, the court determines the

---

[6]      GRI 1 states, in full:

The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the [subsequent GRIs].

GRI 1, HTSUS.

appropriate classification of merchandise "according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. The HTSUS section and chapter notes "are not optional interpretive rules," but rather have the force of statutory law. *Aves. in Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (quoting *Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 926 (Fed. Cir. 2003)).

"Only after determining that a product is classifiable under [a specific] heading should the court look to the subheadings . . . ." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). Moreover, "the possible [tariff] headings are to be evaluated without reference to their subheadings, which cannot be used to expand the scope of their respective headings." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014) (citing *Orlando Food Corp.*, 140 F.3d at 1440). "[T]he court also may consider the Explanatory Notes to the Harmonized Commodity Description and Coding System [(the "Explanatory Notes")], developed by the World Customs Organization." *See Rubies Costume Co. v. United States*, 41 CIT __, __, 279 F. Supp. 3d 1145, 1154 (2017) (citation omitted). The Explanatory Notes (unlike the section and chapter notes) are not legally binding or dispositive, but "may be consulted for guidance and are generally indicative of the proper interpretation of the various HTSUS provisions." *Aves. in Leather, Inc.*, 423 F.3d at 1334 (citation omitted).

Once it is determined[7] that merchandise is properly classified under a particular heading, "the court applies GRI 6 to determine the appropriate subheading." *StarKist Co. v. United States*, 29 F.4th 1359, 1361 (Fed. Cir. 2022) (citing *Orlando Food Corp.*, 140 F.3d at 1440); *see also Sony*

---

[7]        As will be seen, the parties agree, and the court concludes, that the appropriate heading is HTSUS 8479 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other machines and mechanical appliances").

*Elecs., Inc. v. United States*, 37 CIT 1748, 1751 (2013) (not reported in Federal Supplement) ("'At

the subheading level, [GRI] 6 controls and gives priority to the terms of those subheadings and

any related subheading notes as well as the relevant section, chapter, and subchapter notes' and

applies GRIs 1-5 as appropriate." (citation omitted)). GRI 6 states:

> For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis,[8] to [GRIs 1-5], on the understanding that only subheadings at the same level are comparable. For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

GRI 6, HTSUS.

Importantly, when interpreting the HTSUS provisions, "[a] tariff term undefined by the

HTSUS is construed in accordance with its common and commercial meaning," which are

presumed to be the same. *ME Global, Inc. v. United States*, 47 CIT __, __, 633 F. Supp. 3d 1349,

1365 (2023) (citation omitted); *StarKist*, 29 F.4th at 1361 (citation omitted). "To assist it in

ascertaining the common meaning of a tariff term, the court may rely upon its own understanding

of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and

other reliable information." *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333,

1337-38 (Fed. Cir. 1999) (citation omitted); *see also Sony Elecs., Inc.*, 37 CIT at 1758-59 (citing

*Perrin v. United States*, 444 U.S. 37, 42 (1979)).

---

8       Black's Law Dictionary defines "mutatis mutandis" as "[a]ll necessary changes having been made; with the necessary changes," meaning that matters or things are generally the same, but to be altered when necessary. *See Mutatis Mutandis*, BLACK'S LAW DICTIONARY (11th ed. 2019).

## DISCUSSION

Plaintiff and Customs agree (as does the court) that the proper heading for classification of the size-reduction machinery is HTSUS 8479 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other machines and mechanical appliances"). *See* GRI 1. They disagree on the appropriate subheading within this heading. Plaintiff argues that Customs' classification of the size-reduction machinery in a basket subheading for "Other" machines was improper because the machines are classifiable in subheading 8479.82.00 as "crushing, grinding, or screening machines." Pl.'s Br. at 3. Customs, on the other hand, argues that the basket subheading of HTSUS 8479.89.94 is correct because the machines' principal function is "cutting or shredding" and "none of the[] processes [listed in Plaintiff's preferred subheading, i.e., crushing, grinding, or screening] reflect the principal function of the machines." Def.'s Br. at 2, 21.

For the following reasons, the court concludes that the machines perform the overlapping functions of crushing and grinding (and less importantly, screening), and therefore, that they are properly classified under HTSUS 8479.82.00 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other machines and mechanical appliances . . . Mixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines").

## I.     Plaintiff's Machines Are Properly Classified Under HTSUS Subheading 8479.82.00

Plaintiff argues that the machines should be classified under subheading 8479.82.00 ("Mixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring

machines") because they "operate by crushing, grinding, and screening," and these functions are found in the terms of the subheading. Pl.'s Br. at 3. Plaintiff is right.

### A.      Plaintiff's Machines Are Crushing Machines

#### 1.      Construction of the Term "Crushing"

In accordance with GRI 6, the court will first construe the term "crushing" according to its common and commercial meaning. For purposes of this discussion, the court relies on its own understanding of the word "crush" and concludes that the Collins Dictionary definition of "crush," submitted by Defendant, provides guidance as to the common and commercial meaning of the term. *See* Def.'s Br. Ex. 14, ECF No. 51-3 ("Def.'s Ex. 14") ("To crush something means to press it very hard so that its shape is destroyed or so that it breaks into pieces."). The court notes that the Collins' definition is in accord with the other definitions suggested by the parties. *See, e.g.*, *id.* Ex. 13, ECF No. 51-3 (Cambridge Dictionary) (defining "crush" as "to press something very hard so that it is broken or its shape is destroyed"); *id.* Ex. 12, ECF No. 51-3 (Merriam-Webster Dictionary) (defining "crush" as "to squeeze or force by pressure so as to alter or destroy structure"); Pl.'s Br. Ex. 3 at 003, ECF No. 55-1 (American Heritage Dictionary) (defining "crush" as "[t]o press between opposing bodies so as to break or injure; mash; squeeze").

There are two parts to the definition of "crush": (1) the action and (2) the result. *See* Def.'s Ex. 14 ("To crush something means to press it very hard so that its shape is destroyed or so that it breaks into pieces."). This is to say, (1) the action involves pressing the material very hard and (2) the result is that the material's shape is destroyed, or that the material is broken into pieces. Under this definition, "crushing" occurs at two points in Plaintiff's machines. First, crushing occurs between the hydraulic ram and the cutting rotor. Crushing happens a second time between the cutting inserts and the counter knife.

### 2.      Crushing Occurs Between the Hydraulic Ram and the Cutting Rotor

At the first stage of the crushing process, waste material is crushed between the hydraulic

ram and the cutting rotor. The hydraulic ram is part of a hydraulic power system and is "operated

using a hydraulic cylinder."[9] Kolbet Dep. 120:3-121:10. The hydraulic cylinder is responsible for

moving the ram toward and away from the cutting rotor. *Id.* 120:25-121:5; 125:8-18; *see also* Pl.'s

Ex. 1 at 003 (identifying "[h]eavy dual cushioned hydraulic cylinders to advance process ram").

The ram "extends out until it almost gets to the rotor" but will never hit the rotor. Kolbet Dep.

124:6-7, 124:16-19. As the ram is extended, it presses the material against the rotor so that the

rotor can act upon the material. Def.'s SOF ¶ 30; *see also* Kolbet Dep. 62:17-20, 126:3-9 ("You

have to be able to move the material to the rotor . . . and you have to be able to keep the material

on the face of that rotor so that rotor is -- can work on that material."); Sturm Dep. 65:7-9 ("[T]he

ram pushes the material *against* the rotor so that the rotor can grab the material." (emphasis

added)).

Gary Kolbet, Vice President of Engineering at Vecoplan, LLC, described the "very high

pressure" of the hydraulic cylinder:

> [T]here is a limit to the amount of pressure that those cylinders will apply, but it is
> *very high pressure*. I mean, it's *pushing really hard*. That's a very violent operation
> along the face of that rotor. It -- It has to be strong to be able to hold that.

Kolbet Dep. 9:9-11, 126:11-18 (emphasis added). In other words, as a result of the hydraulic ram's

connection to the hydraulic cylinder, the very high pressure of the cylinder applies to the ram as

the cylinder pushes the ram forward. By its extension, the ram applies this high pressure to the

waste material as it pushes the material against the rotor. *See* Def.'s SOF ¶ 37; Kolbet Dep. 171:4-

---

[9]      The hydraulic cylinder is run by a hydraulic power pack, which has approximately
10 horsepower. *See* Def.'s SOF ¶ 70; Kolbet Dep. 121:5-19.

172:8 (confirming that the ram applies pressure or force to the waste material to push it to the rotor); *see also* Sturm Dep. 110:2-3 (identifying the hydraulic ram as a "mechanical pusher that pushes the material towards the spinning rotor").

As the ram applies pressure[10] by forcing the waste material against the rotor, the spinning rotor reduces it by the action of the cutting inserts. *See* Pl.'s SOF ¶ 18; Def.'s SOF ¶ 38; *see also* Kolbet Dep. 62:3-20. To withstand this violent action of the rotor, the ram must act as an oppositional force by pressing the material very hard. If the ram did not press the material against the rotor, the material would not be effectively reduced. Kolbet confirmed this in his deposition:

> Q. But the ram needs to keep the material close enough to allow [the rotor to reduce the material]?
> A. You have it. Correct. If that ram . . . pulls back, if -- it'll -- most cases, if that ram pulls back, you -- you've gone to nearly doing nothing.

Kolbet Dep. 126:24-127:5. Thus, if the ram, having pushed waste material to the rotor, prematurely retracts without continuing to hold it against the rotor, the material will not be reduced. Kolbet also described the importance of the ram's pressure in the reduction of bowling balls: "[The bowling ball] needs to get down to the floor [of the cutting chamber] and have the ram apply pressure between -- apply pressure to it where it is between the ram and the face of the rotor." *Id.* 266:17-267:8. The ram, then, crushes the waste material between itself and the rotor. As the ram exerts pressure on the waste material, the material is simultaneously met with pressure from the rotor's cutting inserts, which, through their great force, press into the waste material very hard. Therefore, the material endures the pressure of the ram, on one end, and the pressure of the rotor,

---

[10]     "Pressure" is "force that you produce when you press hard on something." *Pressure*, Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/pressure (last visited Dec. 11, 2023).

by being a resistant object against which the material is pushed. In this manner, the waste material is pressed very hard and "crushed" between the ram and the rotor.[11]

While the pressure from the ram does not by itself reduce the size of the material, absent that pressure no size reduction would take place.

This crushing process is evident in a video[12] demonstrating how the machine crushes a bowling ball.[13] In the video, the hydraulic ram retracts to allow the bowling balls to fall to the bottom of the cutting chamber. *See* Vecoplan Industrial Shredders, *Vecoplan Shreds BOWLING BALLS!*, YOUTUBE (Sept. 7, 2011), https://www.youtube.com/watch?v=JBxWcjMxhkg (last visited Dec. 11, 2023). Then, the ram extends forward and pushes the bowling balls against the rotor, which, using rotating force, breaks them into pieces. As the video concludes, it shows small pieces of waste material exiting the machine.

### 3.    Crushing Occurs Between the Rotor and the Counter Knife

The material is crushed a second time between the rotor and the counter knife. After the rotor's cutting inserts have initially reduced the waste material into pieces (as a result of the ram pressing the material against the rotor), these pieces drop into the space between the rotor and the counter knife. *See* Pl.'s SOF ¶¶ 16, 19; Def.'s SOF ¶ 41; Kolbet Dep. 243:12-21. In this space, the

---

[11]    Regardless of what type of material is being reduced, there is no dispute that the high-torque rotor exerts significant force, through its cutting inserts, upon the waste material, pressing it very hard and breaking (as well as chopping) it into pieces. *See* Def.'s SOF ¶¶ 64, 68, 71. Accordingly, the rotor crushes each type of material. Def.'s Ex. 14 ("To crush something means to press it very hard so that its shape is destroyed or so that it breaks into pieces.").

[12]    The video, while not an exhibit, is on the record, appearing as a link in both Plaintiff's brief and Plaintiff's response to Defendant's first interrogatories. *See* Pl.'s Br. at 18; Def.'s Br. Ex. 1 at 9, ECF No. 51-3. Plaintiff also referenced the video at oral argument.

[13]    While the machine in the video was a different model than the subject machines, it operates in the same manner, as it is "the same machine design" with a minor difference that is not relevant here. *See* Pl.'s Br. at 18; *see also id.* Ex. 14, ECF No. 55-2.

rotor, by its cutting inserts, exerts force and pressure on the pieces of waste material.[14] *See* Kolbet

Dep. 176:1-177:1; *see also id.* at 153:11-14 ("You're applying a force or pressure to the material.

It's being held back by the floor of the machine and the counter knife."). That is, the cutting inserts

press the pieces against the counter knife, which acts as an oppositional force by "resisting the

material from passing."[15] Kolbet Dep. 244:3-8; *id.* at 58:18-59:14. Simultaneously, as the rotor

---

[14]     Kolbet's deposition states:

[Q.] But, again, the -- the space [between the cutting insert and the counter knife] is not the -- it's not how the merchandise is set; right? It's not how the merchandise is -- is provided with a space. It's -- That's how it -- that's how it gets over time; correct?
A. Correct. Yes. Yes.
Q. Okay. Right. Because it says, over time, the edges of the tools become worn and dull, but *grinding and crushing still occurs because force and pressure causes the destruction and size reduction of the feedstock* [i.e., the waste material]; correct? That's what it says?
A. That -- That's true.
Q. And, again, the *force -- the -- the force and pressure comes from the -- the -- the rotating rotor with the -- the V cutters; right?*
A. *Yes. Correct*.

Kolbet Dep. 176:7-177:1 (emphasis added).

[15]     Kolbet's deposition states:

Q. [H]ow do you define -- or what do you mean when you say crushing?
A. Well, *so the cutters [i.e., cutting inserts] apply forces to the material*, and -- and we talked earlier about how there's all these different materials that we process.
So a more rigid material that can provide some resistance against the forces applied by that cutter would be crushed by that cutter. That's -- And it -- And it may -- in that impact, it may be crushed and come apart. It may be crushed and scooped out. It just depends on what material it is specifically.
Q. Okay. So when you -- you say crushed, you -- you mean the result of the impact between the -- the --
A. Yeah --
Q. -- the cutter and the material?
A. Yeah, with the *counter knife holding it and not allowing it to -- to pass*. Yes.

spins, the cutting inserts mesh with the v-shaped recesses of the counter knife to further break the pieces of waste material into smaller pieces. *See* Def.'s SOF ¶¶ 19, 42; Pl.'s SOF ¶ 15; *see also* Def.'s Br. Ex. 5, Beusse Dep. 66:19-67:5, ECF No. 51-3 ("Beusse Dep."). Thus, by exerting force and pressure on these pieces to press them against the counter knife and break them, the rotor's cutting inserts "crush" the pieces of waste material. At this stage size reduction does not take place solely by the action of crushing—the cutting inserts are sharp and thus the force of crushing is assisted by the chopping action of the counter knife's sharp teeth.

Testimony from Plaintiff's former Chief Operating Officer, Len Beusse, confirms that this second process involves "crushing." Beusse Dep. 4:21-23. Mr. Beusse described the interaction between the rotor and the counter knife as a "punch and die" concept, where the punch is the cutting insert, and the counter knife is the die: "anything that punches through a die to . . . generate a part or a particle would be considered a punch and die concept." *Id.* 163:24-164:15. Put another way, the cutting inserts on the rotor "punch" through the stationary counter knife, breaking the material. Punching indicates force or pressing very hard and is consistent with the "high torque" nature of the rotor, which spins with great force and power. *See Punch*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/punch (last visited Dec. 11, 2023) (defining "punch" as "to strike with a forward thrust especially of the fist"; "to drive or push forcibly by or as if by a punch").

---

Kolbet Dep. 58:18-59:14 (emphasis added). This indicates that the rotor's cutting inserts press the material against the counter knife, which holds the material in place as the cutting inserts crush the material.

Kolbet provided additional explanation on how the counter knife resists the material: "This primary function of this machine is the *counter knife is resisting the material from passing, and the rotor is acting upon the material grinding and crushing it*. That is the primary function." *Id.* 244:3-8 (emphasis added). In other words, the primary function of the machine is grinding and crushing because the counter knife resists the material from passing as the rotor acts upon it.

Thus, when the rotor's cutting inserts punch through the counter knife, they are using significant force to further break down the pieces of waste material that are pressed against the stationary counter knife. By this application of force, the pieces of material are being pressed very hard against the counter knife and crushed a second time into smaller pieces. Again, in this second operation there is both the "action" and "result" needed to satisfy the definition of crushing. The action is the pressing force applied by the moving cutting inserts against the stationary counter knife. The result is the reduction of the material to smaller pieces. As with the first step of the process, the material is reduced in size by a combination of crushing and chopping. Absent the function of crushing, however, the material would not be reduced in size.

### 4.    Defendant's "Crushing" Argument Is Unpersuasive

Defendant makes two arguments as to why the machines do not crush. According to Customs, the machines' work "does not involve the squeezing of material between two opposing bodies or the exertion of 'very hard' pressure to alter or destroy the material" and because the action of the machines does not "reduce the material to particles, as is anticipated by the common meaning of the term 'crush.'" Def.'s Br. at 27-28.

As to this first argument, as seen in the previous discussion, there is no question that the machines squeeze the material between opposing bodies and exert "very hard" pressure, resulting in the destruction of the material by reducing it to pieces. The opposing bodies of the ram and the rotor apply pressure, as do the cutting inserts against the counter knife.

Next, Customs cites a definition of "crush" from the Merriam-Webster Dictionary as support for the proposition that the result of crushing must be that the material is reduced to "particles." Def.'s Br. at 27. Although the second meaning from the definition of "crush" cited by Defendant does mention particles, when that definition is read in its entirety, it is clear that the

common and commercial meaning of "crush" does not require that the result of crushing be particles. Defendant cites the Merriam-Webster Dictionary definition of "crush":

> 1a: to squeeze or force by pressure so as to alter or destroy structure
>     crush grapes
>  b: to squeeze together into a mass
>     She crushed her clothes into a bag.
> 2 : to reduce to particles by pounding or grinding
>     crush rock
> 3a: to subdue completely
>     The rebellion was crushed.
>  b: to cause overwhelming emotional pain to (someone)
>     Her insults crushed him.
>  c: to oppress or burden grievously
>     crushed by debt
>  d: to suppress or overwhelm as if by pressure or weight
> 4 : crowd, push
>     [we] were crushed into the elevator
> 5 : hug, embrace
>     She crushed her child to her breast.
> 6   archaic: drink

*See* Def.'s Br. Ex. 12 (Merriam-Webster Dictionary). It is worth noting that the first meaning the definition provides for "crush" is in accord with the Collins Dictionary. *Compare id.* (defining "crush" as "to squeeze or force by pressure so as to alter or destroy structure") *with* Def.'s Ex. 14 (Collins Dictionary) ("To crush something means to press it very hard so that its shape is destroyed or so that it breaks into pieces."). In fact, material can be the result of crushing if its shape is merely altered or destroyed. *See* Def.'s Ex. 14 (Collins Dictionary) ("To crush something means to press it very hard so that its shape is destroyed *or* so that it breaks into pieces." (emphasis added)). Customs' citation of the second meaning ("to reduce to particles by pounding or grinding") is certainly a valid meaning for the word "crush" but does not change the court's conclusion that the act of crushing need not result in "particles."

Because the machines perform the function of crushing by both the action of pressing the material very hard and by the result of the material being broken into pieces, they perform the function of crushing.

**B.      Plaintiff's Machines Are Grinding Machines**

**1.      Construction of the Term "Grinding"**

In addition to performing the function of crushing, Plaintiff's machines function as grinding machines. "Grinding" is another term found in subheading 8479.82.00 ("Mixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines").

Plaintiff urges the court to construe "grinding" broadly: "a grinder is a machine that break [sic] input material into relatively smaller 'bits or fine particles.'" Pl.'s Br. at 7. Customs, on the other hand, argues that there are two relevant components to the definition of "grinding": "Consistent throughout [both parties'] definitions is both [1] a description of the process, characterized by the use of pressure, force or friction between hard surfaces, and [2] the end result or output material from the 'grinding' process, described as material broken down into very small pieces, particles or powder." Def.'s Br. at 18. In support of its argument, Defendant submitted the Collins Dictionary definition of "grind." *Id.* at 17; Def.'s Ex. 14 (Collins Dictionary). Although Defendant directs the court's attention to the first and second meanings found in the definition, the entry also includes: "to chop into small pieces or fine particles by means of sharp metal blades" as one meaning. Def.'s Ex. 14 (Collins Dictionary).

Other dictionary sources include as a meaning both the idea of cutting with blades and that the result of grinding need not be "particles or powder." *See, e.g.*, Def.'s Br. Ex. 15, ECF No. 51-3 (Macmillan Dictionary) (defining "grind" as "to cut food, especially raw meat, into very small

pieces using a machine"); *Grind*, THE BRITANNICA DICTIONARY, https://www.britannica.com/dic tionary/grind (last visited Dec. 11, 2023) (defining "grind" as "to cut (meat) into small pieces by putting it through a special machine"). Relying on its own understanding of the term and considering dictionary definitions, the court concludes that, included in the common and commercial meaning of "grind," is "to chop into small pieces or fine particles by means of sharp metal blades." Def.'s Ex. 14 (Collins Dictionary). It is evident that "grinding" is "broad enough to cover a variety of processes by which materials are divided into relatively small particles" and, while "definitions of grinding contemplate a reduction to small particles *or* to powder," no definition "gives actual limiting dimensions of the particles or powder included in the definition of the word 'grind' or 'ground.'" *United States v. Colonial Commerce Co.*, 44 C.C.P.A. 18, 20-21 (1956).[16] Thus, while "grinding" may involve a process of size reduction that results in output material that can be described either as "small pieces" or "fine particles," there is no defined requirement as to how small these pieces must be. Construing the term in this way confirms that Plaintiff's machines are also grinding machines.

**2.    Process of Size Reduction**

As relevant here, "grind" includes chopping using sharp metal blades in the process of size reduction. *See* Def.'s Ex. 14 (Collins Dictionary) (defining "grind" as "to chop into small pieces or fine particles by means of sharp metal blades"). Chop is synonymous with cut. *See Chop*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/chop (last visited Dec. 11,

---

[16]    The court finds instructive the interpretation of "grinding" in *Colonial Commerce*. *See JVC Co.*, 234 F.3d at 1355 ("While prior TSUS cases may be instructive in interpreting identical language in the HTSUS, they are not dispositive."). In *Colonial Commerce*, while the tariff term was "ground" ("Spices and spice seeds: . . . sage, unground, 1 cent per pound; ground, 3 cents per pound"), the court considered the meaning of "grinding" because "ground" is "the past tense of the verb 'grind,'" and "must necessarily include consideration of the process employed as well as the end result." *Colonial Commerce*, 44 C.C.P.A. at 19-20.

2023) (defining "chop" as "to *cut* into or sever usually by repeated blows of a sharp instrument" (emphasis added)); *see also Chop*, COLLINS DICTIONARY, https://www.collinsdictionary.com/dict ionary/english/chop (last visited Dec. 11, 2023) (stating, by way of example, "[i]f you chop something, you cut it into pieces with strong downward movements of a knife or an axe"); *id.* (defining "chop" as "to cut (something) with a blow from an axe or other sharp tool" and "to cut into pieces"). Thus, chopping (or cutting) is one process by which material may be ground.

In Plaintiff's machines, chopping or cutting occurs when the cutting inserts on the spinning cutting rotor "cut" the waste material to reduce it in size. *See* Pl.'s SOF ¶¶ 12, 18; Def.'s SOF ¶¶ 19, 38. The use of "sharp metal blades" to chop or cut the material is present here. The cutting rotor, the "core part of the machine," has between 42 and 74 or over 84 cutting inserts (depending on the model of machine). *See* Def.'s SOF ¶¶ 16, 23, 27. These cutting inserts are sharp and have four points that can be rotated when dull to ensure a sharper edge interacts with the waste material—essentially acting as sharp blades.[17] *See id.* ¶¶ 24-25. To be sure, this cutting or chopping happens in concert with the action of crushing—both functions, crushing and grinding, occur together. Therefore, the action of the cutting rotor with its sharp cutting inserts on the waste material is consistent with the definition of "grind."

In this way, Plaintiff's machines are akin to a coffee grinder. A coffee grinder is typically one of three types: a blade grinder, a conical burr grinder, or a flat burr grinder. A blade grinder consists of a propellor-like blade, which spins and chops the coffee beans into small pieces. *See*

---

[17]     "Blade" is defined as "[t]he blade of a knife, axe, or saw is the flat sharp part that is used for cutting" and as a "rotor blade." *Blade*, COLLINS DICTIONARY, https://www.collinsdictionary.com/dictionary/english/blade (last visited Dec. 11, 2023); *see also Blade*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/blade (last visited Dec. 11, 2023) (defining "blade" as "the cutting part of an implement"; "the broad flat or concave part of a machine (such as a bulldozer or snowplow) that comes into contact with the material to be moved").

Pl.'s Br. Ex. 5, ECF No. 55-1. So, too with a meat grinder where blades are used to cut meat into smaller pieces. *See id.* Ex. 9, ECF No. 55-1; *id.* Ex. 10, ECF No. 55-1.[18]

The function of the blade coffee grinder, or of a meat grinder, is similar to that of the cutting rotor on Plaintiff's machinery, which spins and chops up the waste material into small pieces. Additionally, burr coffee grinders and meat grinders possess many cutting edges that, to give the best grind of the coffee beans or reduce the size of a piece of meat, must remain sharp. *See id.* Exs. 9-10; *id.* Ex. 7, ECF No. 55-1 ("Dull burrs slowly do less grinding and more mashing."); *id.* Ex. 8, ECF No. 55-1 ("It's important to keep your grinder and burrs sharp as this makes your homemade coffee ground consistent and taste better."). Similarly, the cutting rotor on Plaintiff's machines has numerous cutting inserts that, ideally, remain sharp to grind the waste material. *See* Def.'s SOF ¶¶ 24-25, 35, 44. Thus, like a coffee grinder or a meat grinder, under the common meaning of "grinding," Plaintiff's machines "grind" the waste material.

That this grinding function works in concert with the crushing action of the machines demonstrates the overlapping nature of the crushing and grinding functions. Just as the cutting

---

[18]    The court concludes, over Defendant's objection, that it is not precluded from considering Plaintiff's website exhibits about coffee and meat grinders because they are not offered to support or dispute a fact. USCIT R. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Rather, they are offered as examples of common usage to interpret the tariff term "grinding"—a legal question. The dictionary definition of "grinding" itself references, as an example, use of a coffee grinder. *See* Def.'s Ex. 14 (Collins Dictionary) (defining "grind" as "to chop into small pieces or fine particles by means of sharp metal blades[,e.g.,] *to grind coffee beans*"). Even if Plaintiff's exhibits were offered to support a fact, "for summary judgment purposes, the inquiry is whether the cited evidence may be reduced to admissible form, not whether it is admissible in the form submitted at the summary judgment stage." *United States v. Sterling Footwear, Inc.*, 41 CIT __, __, 279 F. Supp. 3d 1113, 1124 (2017). Notably, Defendant has cited no Federal Rule of Evidence, or other authority, in support of its objection to the admissibility of Plaintiff's exhibits. *See* Def.'s Br. at 26; Def.'s Reply at 17-18.

inserts perform a crushing action against the counter knife, the blades of the cutting inserts perform a grinding action against the counter knife by chopping the waste material.

### 3.      Size of the Output Material

Although the output of the grinding function includes "small pieces or fine particles," no exact size is required. Def.'s Ex. 14 (Collins Dictionary); *see Colonial Commerce*, 44 C.C.P.A. at 21. The size of Plaintiff's output varies, depending on what type of waste material is fed into the machine and what size screen is used. *See* Def.'s SOF ¶ 60. A screen is almost always used and has openings that range from 3/8 inch in diameter to six inches in diameter. *See id.* ¶ 57; Pl.'s Resp. SOF ¶ 57. A commonly used screen is the 3/4-inch screen. *See* Sturm Dep. 87:4-6. Material must be small enough to pass through the screen, and if it is not, it goes back to the cutting chamber for further size reduction. Pl.'s SOF ¶ 16; Def.'s SOF ¶ 59. Output material can sometimes be larger than the size of the screen's opening owing to the material's shape. Def.'s SOF ¶ 63. While the parties do not say exactly what the output size consistently is—because it varies, depending on the type of material being reduced and the screen size—commonly, the output size is between one and three inches. *See* Def.'s SOF ¶¶ 60-61; *see also* Kolbet Dep. 230:9-22. It seems, therefore, that the smallest output ranges from 3/8 inch (the smallest screen size) to one inch (the more common output size).

The output size of material processed through Plaintiff's machines is "small pieces." For instance, Kevlar helmets, processed with a 3/4-inch screen, result in a uniform output size similar in appearance to small pieces of cotton. *See* Pl.'s Br. Ex. 15, ECF No. 55-2. Teflon purge,[19] also

---

[19]      Teflon is a trademark for polytetrafluoroethylene ("PTFE"), a chemical compound that serves as a coating commonly found on nonstick cookware. It is also manufactured into certain industrial products like bearings, pipe liners, and parts for valves and pumps. *See Polytetrafluoroethylene*, BRITANNICA, https://www.britannica.com/science/polytetrafluoroethylene (Oct. 20, 2023).

processed with a 3/4-inch screen, results in small pieces of material comparable to croutons. *See id.* Even bowling balls processed with a two-inch screen are broken into small chunks. *See id.* Material that has been processed without a screen, like vinyl flooring, is larger. *See id.* It is not typical, however, to use the machines without a screen. *See* Sturm Dep. 60:2-12; Kolbet Dep. 89:5-9. Even at variable sizes, the output of the machines, fitting through a 3/4-inch screen, or even ranging from one to three inches, is still "small pieces." As small pieces, the output material fits the definition of "grind." Therefore, Plaintiff's machines are grinding machines because (like meat grinders) they chop waste material into small pieces by means of the rotor's sharp cutting inserts and the sharp teeth of the counter knife. *See* Def.'s Ex. 14 (Collins Dictionary) (defining "grind" as "to chop into small pieces or fine particles by means of sharp metal blades").

### C.     Plaintiff's Machines Are Screening Machines

A screen is almost always used when processing waste material in Plaintiff's machines. *See* Def.'s SOF ¶ 57; Sturm Dep. 60:2-12 ("Ninety-nine percent of the applications require a screen. . . . There's very, very little occasions where you would say a screen is not necessary, but the utmost number of applications that I know would definitely require a screen."). As has been seen, the screen's role is to only allow material which is small enough to fit through the screen's holes to exit the machine.[20] Def.'s SOF ¶ 58. If material is too large to pass through the screen, it moves back to the cutting chamber for additional size-reduction. *Id.* ¶ 59. The verb "screen" means to "separate or sift out by means of a sieve or screen." Pl.'s Br. Ex. 3 at 008 (American Heritage Dictionary); *see also id.* at 016 (Random House Dictionary) (defining screen as "to sift or sort by passing through a screen"). Therefore, because Plaintiff's machines separate waste material by

---

[20]     Sometimes, however, material that is larger than the size of the screen's opening passes through the screen, owing to the shape of the material. Def.'s SOF ¶ 63.

allowing material that fits through the screen's holes to exit the machine, and sending back for

further size-reduction material that is too large, Plaintiff's machines are screening machines. The

screen too, acts in concert with the crushing and grinding functions of Plaintiff's machines.

## II.     Because the Functions of Crushing, Grinding, and Screening Work in Concert to Accomplish the Machines' Purpose of Reducing the Size of Waste Material, the Machines Are Properly Classified Under HTSUS Subheading 8479.82.00

For Plaintiff, its machines are "crushing, grinding, and screening machines that reduce the

size of waste products to produce valuable material for recycling. The machines operate by

crushing, grinding, and screening to reach the desired output." Pl.'s Br. at 3. Accordingly, Plaintiff

argues that "[t]hese machines . . . are crushing, grinding, and screening machines. They are,

therefore, properly classified in 8479.82.00." Pl.'s Br. at 29.

## III.    Plaintiff's Machines Are Properly Classified Under HTSUS Subheading 8479.82.00

As noted, both parties claim, and the court agrees, that Plaintiff's size-reduction machines

are properly classified under heading 8479, which provides: "Machines and mechanical appliances

having individual functions, not specified or included elsewhere in this chapter; parts

thereof: . . . Other machines and mechanical appliances."

The court further concludes that Plaintiff's machines are properly classified under

subheading 8479.82.00 ("Mixing, kneading, crushing, grinding, screening, sifting, homogenizing,

emulsifying or stirring machines"). This conclusion is reached by a straightforward application of

GRI 6, which provides that "the classification of goods in the subheadings of a heading shall be

determined according to the terms of those subheadings." GRI 6. As has been seen, in order to

perform size reduction, the machines always use two of the functions found in the terms of the

subheading, i.e., "crushing" and "grinding" and one of the functions, "screening," most of the time. That the functions overlap does not detract from the conclusion that the machines are properly classified under HTSUS subheading 8479.82.00. Rather, this overlap confirms it, by demonstrating that machines performing these functions are the kinds of machines the drafters intended to be classified under this subheading by the inclusion of the terms therein.

Customs' contention that the machines should be classified under the basket subheading 8479.89.94 "Other" machines cannot be credited. Indeed, Customs' analysis is more inventive than legal.

In its analysis Customs first determined what the machines were and then took the surprising step of finding that they perform the functions of "cutting or shredding."[21] Def.'s Br. at 21 ("Plainly, the principal function of the machines can be described as cutting or shredding, as those terms are defined by their common meaning . . . ."). For Customs, because the functions of "cutting or shredding" are not found in the terms of any subheading under heading 8479 then they must be classified under the basket category. *See* Def.'s Br. at 17.

By first finding that the machines perform the functions of "cutting or shredding," Customs has turned the GRI 6 analysis on its head. Customs would have the court find that GRI 6 should be applied in the following way: (1) first, determine the function of the machines as being "cutting or shredding" and nothing more; (2) then, search terms of the subheadings under heading 8479 for

---

[21]         For Customs, note 3 to section XVI applies:

> Unless the context otherwise requires, composite machines consisting of two or more machines fitted together to form a whole and other machines designed for the purpose of performing two or more complementary or alternative functions are to be classified as if consisting only of that component or as being that machine which performs the principal function.

Section XVI, Note 3, HTSUS.

those words, and those words only; and (3) hold that since those words are not found in any subheading, the machines must necessarily be classified under the basket category of subheading 8479.89.94.

This, however, is not the way GRI 6 is usually applied. Under the usual analysis, once it has been determined what the article is, a two-step process is performed: the classifier first "ascertain[s] the meaning of the specific terms in the tariff provision" and then "determine[s] whether the goods come within the description of those terms." *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (citation omitted). The terms can describe the merchandise in a number of ways, for example, by name (*eo nomine*) or by use or, as here, by the function or functions of the machines. Using this straightforward analysis, the terms "crushing" and "grinding" (and "screening" too) can be said to describe the functions by which the machines reduce the size of the waste material.

In its papers, Customs also claims that a principal function analysis is directed by note 3 to section XVI. The note provides:

> Unless the context otherwise requires, composite machines consisting of two or more machines fitted together to form a whole and other machines designed for the purpose of performing two or more complementary or alternative functions are to be classified as if consisting only of that component or as being that machine which performs the principal function.

Section XVI, Note 3, HTSUS.

First, the note does not apply to Plaintiff's machines because they are not "composite" machines. *See McKesson Canada Corp. v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1310, 1316 n.7 (2019) ("Examples of composite machines are: 'printing *machines* with a subsidiary *machine* for holding the paper (heading 84.43); a cardboard box making *machine* combined with

an auxiliary *machine* for printing a name or simple design (heading 84.41); . . . a cigarette making

*machinery* combined with a subsidiary packaging *machinery* (heading 84.78)." (emphasis added)).

More importantly, any comparison of functions made under the facts of this case would

not be the sort anticipated by the note. In *Sony Electronics Inc. v. United States*, a case involving

subheadings, the court found that the merchandise at issue (Sony's Net-Sharing Cam) was "a

machine capable of two functions, i.e., capturing moving and still images" and "both of those

functions are described by subheading 8525.80.40." 37 CIT at 1767. The court concluded:

> Note 3 is only applicable where an item possesses multiple functions that are
> accounted for in different tariff provisions. Where a heading describes all of the
> functions of a multifunction article, an analysis of the principal function under Note
> 3 is not necessary. As noted, subheading 8525.80.40 covers all of the primary
> functions of the merchandise. Consequently, a principal function analysis is not
> appropriate.

*Id.* Thus, where the functions of a machine are found under one heading or subheading, "a principal

function analysis is not appropriate." *Id.* Here, all of the functions (crushing, grinding, and

screening) are described by the terms of one subheading. Thus, a principal function analysis under

note 3 to section XVI is not provided for.

Finally, the note does not provide for Customs' comparing terms of its own choosing with

those in the HTSUS. Rather, it provides for comparison of terms actually found in headings or

subheadings of the HTSUS.

Because the function of the machines is found in the overlapping terms "crushing,"

"grinding," and "screening," the court concludes that they are not properly classified under

Customs' proposed basket subheading.

## CONCLUSION

For the foregoing reasons, the court holds that the subject size-reduction machines are classifiable under HTSUS 8479.82.00 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: . . . Other machines and mechanical appliances . . . Mixing, kneading, crushing, grinding, screening, sifting, homogenizing, emulsifying or stirring machines"). The court grants Plaintiff's motion for summary judgment and denies Customs' cross-motion for summary judgment. Judgment will be entered accordingly.

                                                            /s/ Richard K. Eaton
                                                                 Judge

Dated: December 11, 2023
        New York, New York